Marvin JONES, on his own behalf and on behalf of those similarly situated, Plaintiffs-Appellants,

v.

Fred R. DIAMOND, etc., et al., Defendants-Appellees.

No. 78–1289.

United States Court of Appeals, Fifth Circuit.

April 26, 1979.

998

1000

David M. Lipman, Miami, Fla., John L. Walker, Jackson, Miss., Lennox S. Hinds, Nat'l Conference of Black Lawyers, Harlem, N. Y., for plaintiffs-appellants.

Raymond L. Brown, Pascagoula, Miss., for defendants-appellees.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

COLEMAN, Circuit Judge.

This is a 42 U.S.C. § 1983 challenge to nearly every conceivable facet of the Jackson County jail at Pascagoula, Mississippi, in use at the time the lawsuit was filed and the case was tried.

Since oral argument before us, a *new* jail designed for *single* cell occupancy, with approximately 80 square feet to the cell, has been opened. In uncontroverted post argument affidavits, we have been assured that the "old jail" will hereafter be in limited use to detain individuals for short periods of time while they are in the process of supplying bail, and the like. Since the old jail is not to be closed and could be returned to its former functions, we shall decide this appeal on the merits. We are, however, entitled to take into consideration the existence of the new jail, *Smith v. Sullivan,* 5 Cir., 1977, 553 F.2d 373. We must remember, also, that except where neces-

sary to maintain federal constitutional rights, federal courts do not sit to supervise state prisons, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

Unlike the situation in some prisons, the conditions in the Jackson County jail cannot accurately be described as "uncivilized" or as "barbaric and inhumane".[1]

The case is unusual in that the State of Mississippi, in violation of prior precedent, has seen fit to temporize by directing that many convicted felons be held in county jails while the penitentiary is slowly, ever so slowly, being brought up to constitutional standards. Hence, in this particular jail setting we are dealing with the federal constitutional rights of convicted felons, convicted misdemeanants, and pretrial detainees, held in a county jail, not in a penitentiary.

This necessitates recognition of the Constitutional distinctions between convicts and pretrial detainees.

Convicted prisoners are entitled to the protection of the Eighth Amendment, which prohibits cruel and unusual punishment.

"[C]onfinement conditions of a pretrial detainee, it must be analyzed as a due process deprivation rather than as cruel and unusual punishment", and a detainee is entitled to relief only if jail conditions amount to a violation of Due Process, *McMahon v. Beard,* 5 Cir., 1978, 583 F.2d 172.

Pretrial detainees have not yet been convicted of any offense and are accorded the presumption of innocence when brought to

---

1. In *Miller v. Carson,* 5 Cir. 1977, 563 F.2d 741, 743, we described the conditions in the Duval County, Florida jail as "uncivilized". Eighty five per cent of the inmates were *pretrial detainees.* The others were convicts awaiting routine assignment to state or federal penal institutions. The shocking conditions in the jail are set forth in detail, 563 F.2d 744–746. No useful purpose would be served by repeating them here.

In *Pugh v. Locke,* 406 F.Supp. 318, 331 (M.D. Ala.1976), *aff'd in part sub nom. Newman v. State of Alabama,* 5 Cir. 1977, 559 F.2d 283, the District Court described conditions in the Ala-

bama penitentiary system as "barbaric and inhumane".

In *Newman,* we held that when the *totality of conditions* in a penal institution violates the Constitution, the trial court's remedies are not limited to the redress of specific constitutional rights.

The trial record shows that on the facts in the instant appeal we have neither a *Newman* nor a *Miller* case, although, as will be seen post, in some instances, *not totality of circumstances,* there were some infractions of constitutional rights.

**1004**

trial, but the fact remains that they are being held on probable cause to believe that they are, in fact, guilty of a violation of the criminal statutes.

There was another circumstance of no small importance. In December, 1976, the Jackson County Sheriff found drugs in the jail. In an effort to put a stop to that, he inaugurated a policy of searching all jail visitors, a policy expressly approved in *Newman v. Alabama,* 5 Cir., 1977, 559 F.2d 283, 291. The prisoners responded with a riot, in which they very nearly wrecked the jail. The necessary repairs cost the taxpayers over $30,000.

■ It has been said that the pretrial detainee should not have to suffer conditions any more restrictive than those necessary to ensure his presence for trial, *Duran v. Elrod,* 7 Cir., 1976, 542 F.2d 998, 999; *Rhem v. Malcolm,* 2 Cir., 1974, 507 F.2d 333, 336, 337; *Miller v. Carson,* 5 Cir., 1977, 563 F.2d 741, 750. It is an ineluctable fact, however, that the detainee is in jail, subject to all the institutional necessities that are thus brought into play. "[T]he same practical reasons that counsel judicial restraint in second-guessing correctional officials dictates restraint in second-guessing the authorities who run jails", *Feeley v. Sampson,* 1 Cir., 1978, 570 F.2d 364, 371.

■ Furthermore, for a prisoner to establish a prima facie § 1983 case of cruel and unusual punishment he must prove that the prison authorities acted with deliberate or callous indifference to his constitutional rights. Proof of simple negligence is not enough to pierce official immunity, *Bogard v. Cook,* 5 Cir., 1978, 586 F.2d 399; *Fielder v. Bosshard,* 5 Cir., 1979, 590 F.2d 105.

*Whirl v. Kern,* 5 Cir., 1968, 407 F.2d 781, *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969), was a § 1983 action for false imprisonment wherein it was held that neither good faith nor non-negligence could exculpate a sheriff from Civil Rights Act liability for false imprisonment. *Whirl* has been undercut on both points. First, as to reasonable good faith defense, *Bryan v. Jones,* 5 Cir., 1976, 530 F.2d 1210 (en banc).

Judge Gee would have expressly overruled *Whirl* rather than to have it "materialize from time to time . . . present in form but eviscerated". Three Judges, including the author of the original *Whirl* opinion, said that the majority opinion cast *Whirl* "adrift to become a derelict in the law", 530 F.2d 1219. *See, also, Miller v. Jones,* 5 Cir., 1976, 534 F.2d 1178. Secondly, simple negligence is not enough to pierce official immunity in a § 1983 case, *Bogard v. Cook, supra.*

*The Class Action*

After considerable skirmishing, which in the interest of brevity we need not detail, *see, e. g., Jones v. Diamond,* 5 Cir., 1975, 519 F.2d 1090, the District Court certified a plaintiff class which included

all persons who were incarcerated at the time of the filing of the complaint, or are now, or in the future will be confined in the Jackson County jail, either to serve a sentence or awaiting sentence . . .

On appeal, neither party has attacked the certification. The trial proof concerned both pretrial detainees and convicts. Since the parties and the trial court clearly regarded the class as including all jail inmates, we shall do likewise. This, of course, includes all black prisoners within the certified subclasses, and the claims of racial discrimination are properly here.

■ Jones' individual claims are not before us. In a memorandum opinion dated August 12, 1977, the District Judge stated that "it would be futile and a waste of time to consider and pass upon the class action until after the completion of the construction of the new Jackson County jail next year". Having made that determination, he proceeded to adjudicate Jones' individual claims and found that each of them was "wholly without merit and should be dismissed with prejudice". Eleven days later, a "Partial Judgment" was entered in which Jones' application for a permanent injunction and for damages was "dismissed with prejudice". Jurisdiction over the class action issue was retained and ruling reserved

for a later date. Judgment was then entered on Jones' claims.

Jones did not appeal this judgment. Instead, plaintiff sought a writ of mandamus from this Court to order the Judge to consider the class issues. On November 3, 1977, a panel of this Court issued the writ, but did not consider Jones' claims. Approximately one month later, the District Judge issued a forty eight page memorandum stating his findings of fact and conclusions of law. A decision granting partial injunctive relief was also entered, and the plaintiffs then moved, Rule 24 of the Federal Rules of Appellate Procedure, to appeal in forma pauperis. The Judge granted the motion for the class to appeal, but denied the motion as to Jones because his claims had been dismissed with prejudice on August 23, 1977. On February 6, 1978, Jones moved this Court for leave to appeal the August 23 order in forma pauperis. That motion was denied on May 22, 1978. Thus, Jones's individual claims are not now before us.[2]

▆ Since Jones' individual claims have thus been finally adjudicated and dismissed, can he properly continue to represent the class? Our recent *en banc* decision in the case of *Satterwhite v. City of Greenville*, 5 Cir., 1978, 578 F.2d 987, canvassed the decisions in this area and noted that when a class has been properly certified, the case tried, and the class representative's individual claims determined to be meritless or moot, the representative is not automatically barred from prosecuting an appeal on the class issues. *Id.* at 993, 996. In this case, Jones is a member of the class and certainly has retained a sufficient homogeneity of interests at every moment of the litigation to qualify as an adequate representative. *See Sosna v. Iowa*, 419 U.S. 393, 403 n. 13, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975). Therefore, the class issues are properly before us.[3]

In addition to damages, the plaintiffs sought sweeping injunctive and declaratory relief and alleged violations of the First, Fourth, Sixth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution, cognizable under 42 U.S.C., § 1983. By an amendment to the complaint, the plaintiffs added a pendent state law claim. On appeal plaintiffs pursue their assertions of violations of numerous constitutional rights, which they have grouped into the following categories: (1) right to recreation, (2) overcrowding, (3) right to adequate medical care, (4) visitation, (5) utilization of

2. We consider the denial of the motion to appeal in forma pauperis as a determination that the August 23, 1977, order was final and appealable under Rule 54(b) of the Federal Rules of Civil Procedure. In any event, the judgment of the prior panel is binding on us.

3. The defendants are the Jackson County sheriff, the jailer, the members of the county Board of Supervisors, and their successors in those respective offices. Fred Diamond was Sheriff from January 5, 1972 to January 5, 1976. John Ledbetter then became the Sheriff and has continued in office to the present time. Roy Tootle was the jailer under defendant Diamond, and Jack Broadus is the present jailer. Lum R. Cumbest, Ed Khayat, J. C. May, and W. T. Roberts have been members of the Board of Supervisors throughout this litigation. Olin H. Davis died in office in 1975 and was replaced by Ed McElroy, who is still a member of the Board.

The complaint also named as a defendant "Andrew Thomas . . . individually and as representative of all other trustys at the Jackson County, Mississippi Jail." Apparently, plaintiffs sought to have a defendant class of all trusties certified, but the District Judge refused to so certify a defendant class. Plaintiffs have not appealed that ruling.

Another problem which concerns the identity of the parties to this lawsuit involves United States Fidelity and Guaranty Company, the surety company which executed the bond which would indemnify the sheriff in the event he is found liable for damages. On April 24, 1974, plaintiffs moved to amend the complaint to add Fidelity as a defendant. By an order dated May 10, the District Judge granted that motion, but in that same order he dismissed the supervisors from the suit and refused to permit the suit to proceed as a class action. Plaintiffs appealed and were victorious in this Court. *See Jones v. Diamond*, 5 Cir. 1975, 519 F.2d 1090. We noted that Fidelity had been added to the suit as a defendant. *Id.* at 1094 and n. 3. However, an examination of the record reveals a glaring discrepancy. No process was ever served on Fidelity. It is possible that process was served on Fidelity, and that it has participated in this litigation, but nothing in the record serves to indicate that this was so.

trusties, (6) racial segregation, (7) right to an adequate diet, (8) right to uncensored communication, (9) right to fair disciplinary proceedings, (10) a proper classification system, (11) right to protection (inmate security), (12) physical facilities, and (13) right to access to the courts. They also press their pendent state law claims.

## THE MISSISSIPPI PENAL SYSTEM

Since shortly after 1900, Mississippi has operated a centralized prison system at Parchman and until recently all felons sentenced to prison were confined at that place. Parchman is not a walled prison but a state prison farm, occupying thousands of acres.

Each county has a jail, generally used to hold misdemeanants and persons awaiting trial or those convicts awaiting the outcome of an appeal in non-bailable offenses. The counties, not the state, have sole responsibility for the erection, maintenance and operation of these jails.

The State of Mississippi has been in prolonged, extensive litigation in the federal courts over conditions at its penitentiary.[4] Those prisoners who cannot be received at Parchman are now confined in county jails across the state,[5] and the legislature has, for how much longer we do not know, shifted a substantial part of the operation and costs of its penitentiary system to the 82 counties, whose Boards of Supervisors, the county governing and taxing authority, are powerless to alter the statutes which control the operations of the criminal justice system. Astonishingly enough a recently enacted state statute authorizes convicted persons to serve all or a part of their sentences in a county jail, provided that the

---

4. The history of that lengthy litigation must be read in its entirety to be understood. *See Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss. 1972), *aff'd*, 5 Cir. 1974, 501 F.2d 1291 (holding many practices and conditions at Parchman unconstitutional); *Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975) (ordering submission of a comprehensive plan to implement adequate medical service and to reduce overcrowding); *Gates v. Collier*, 407 F.Supp. 1117 (N.D.Miss. 1975) (denying plaintiffs' motion to accelerate compliance timetable); *Gates v. Collier*, 423 F.Supp. 732 (N.D.Miss.1976), *aff'd*, 5 Cir. 1977, 548 F.2d 1241 (upholding the issuance of a temporary restraining order requiring officials to close certain camps and insure that each inmate has 50 sq. ft. of living space). The issue of attorneys' fees alone has bounced back and forth between the district court and this Court. *See Gates v. Collier*, 371 F.Supp. 1368 (N.D. Miss.1973), *aff'd*, 5 Cir. 1973, 489 F.2d 298, *vacated and remanded*, 5 Cir. 1975, 522 F.2d 81 (en banc), *on remand*, 70 F.R.D. 341 (N.D.Miss. 1976), *aff'd in part and rev'd in part*, 5 Cir. 1977, 559 F.2d 241.

In the past ten years, the two federal district courts in Mississippi, and this Court on appeal, have resolved numerous suits concerning the conditions in Mississippi's prison, jails, and juvenile detention centers, in addition to the *Gates* litigation. *See, e. g., Roberts v. Williams*, 302 F.Supp. 972 (N.D.Miss.1969), *aff'd in part*, 5 Cir. 1972, 456 F.2d 819, *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971); *Coleman v. Aycock*, 304 F.Supp. 132 (N.D. Miss.1969) (Greenville ordered to desegregate jail); *Patterson v. Hopkins*, 350 F.Supp. 676 (N.D.Miss.1972), *aff'd*, 5 Cir. 1973, 481 F.2d 640 (ordering modifications to the Coahoma County jail in order to detain juveniles); *Ballard v. Taylor*, 358 F.Supp. 409 (N.D.Miss.1973) (action against sheriff for damages caused by beating and failure to provide medical care barred by statute of limitations); *Cole v. Tuttle*, 366 F.Supp. 1252 (N.D.Miss.1973), *appeal dismissed*, 5 Cir. 1976, 540 F.2d 206 (suit against members of board of supervisors of Panola County to remedy jail conditions dismissed for failure to state a claim upon which relief could be granted); *Leonard v. Miss. State Probation and Parole Bd.*, 373 F.Supp. 699 (N.D.Miss. 1974), *rev'd*, 5 Cir. 1975, 509 F.2d 820, *cert. denied*, 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373 (1975) (no retroactive application of *Gates v. Collier*, 5 Cir. 1974, 501 F.2d 1291); *Stevenson v. Reed*, 391 F.Supp. 1375 (N.D.Miss.1975), *aff'd*, 5 Cir. 1976, 530 F.2d 1207, *cert. denied*, 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976); *Bogard v. Cook*, 586 F.2d 399 (5 Cir. 1978) (action for damages based upon stabbings and shooting which occurred at Parchman); *Morgan v. Sproat*, 432 F.Supp. 1130 (S.D.Miss.1977) (challenge to conditions at Oakley Training School, an institution for delinquent boys).

5. Of the 43 prisoners held in the Jackson County jail on February 14, 1977, 21 were convicts that Parchman officials refused to accept because of the overcrowding at that facility. On June 20, 1977, there were 74 prisoners, 57 of whom should have been confined at Parchman. Therefore, on those dates the inmate population of the Jackson County jail would have been 22 and 17, respectively, but for the deficiencies at Parchman.

department of corrections certifies to the county sheriff that there is no space available for the convict in the state penitentiary, Miss.Code Ann. § 47–5–112 (1978 Supp.). Apparently, this statute is designed as a temporary measure, for it was scheduled to expire of its own terms on February 28, 1979. Under this kind of system, the overcrowding at Parchman was exported to the county jails and those who have to support, maintain, and operate those jails have been powerless to reject the system.

In Mississippi, an intricate statutory scheme regulates the erection, maintenance, and administration of county jails. Broad oversight responsibility for all facets of the county jail is lodged with the county board of supervisors. *See* Miss.Code Ann. § 19–3–41 (1972). The board is required, at least quarterly, "[to] examine into the state and condition of the jail, in regard to its safety, sufficiency, and accommodation of the prisoners, and from time to time take such legal measures as may best tend to secure the prisoners against escape, sickness, and infection, and have the jail cleansed." *Id.* § 19–5–1. They are authorized to levy taxes, *id.* § 19–3–41, and to appropriate funds from the county treasury, *id.* § 19–3–59. They may employ janitors and other assistants as required. *Id.* § 19–7–13. Finally, if the jail needs remodeling, enlarging, or repairing, state law charges the Board of Supervisors with the duty to erect a new jail or renovate the existing jail. *Id.* § 19–7–11. This requirement, however, can be nullified if the voters refuse to approve the necessary bond issues.

The sheriff is the local official charged with the responsibility for day-to-day operation of the jail. He has charge of the jail and of the prisoners. He has a duty to protect both from "mob violence, from any injuries or attacks by mobs or otherwise, and from trespasses and intruders." *Id* § 19–25–69. He shall keep the jail in a "clean and comfortable condition" and must prosecute all persons who deface the jail. *Id.* Generally, the sheriff is also the jailer and, "as jailer, shall provide daily wholesome and sufficient food and drink, fire and

lights when necessary and proper, and sufficient and clean bedding for all prisoners . . . ." *Id.* § 19–25–71. *See also id.* § 47–1–51. The statutes further authorize the board of supervisors to choose one of three alternative schemes of feeding prisoners, namely, contracting with a local caterer or restaurant, allowing the sheriff to simply purchase the necessary food and supplies in the name of the county, or granting the sheriff an allowance for such expenses. *Id.* § 19–25–73. Any prisoner may supply himself with food and bedding, but these items must first be inspected by the sheriff. *Id.* § 19–25–71. Lastly the sheriff must also keep separate rooms for the sexes and shall not permit any "communication" between prisoners of different sexes. *Id. See also id.* § 47–1–23.

The state board of health and the county department of health provide guidance and assistance to the sheriff in the areas of health and sanitation. The state board of health has broad oversight responsibility for a myriad of public functions, including prisons. *Id.* § 41–3–15. The directives of the state board of health are to be carried out either by a county health department or a county health officer, as may be determined by each county, based upon its needs. *See generally id.* §§ 41–3–37 through 55.

The state statutory scheme places additional duties on the shoulders of local officials. Once convicted, each prisoner shall be comfortably clothed at the expense of the county. *Id.* § 47–1–47. If a prisoner needs medical attention, the sheriff is charged to examine the prisoner and then, if he thinks it necessary, to call in a physician to attend the prisoner. *Id.* § 47–1–57. Alternatively, the sheriff may take the prisoner to the nearest hospital, and the expenses will be borne by the county if the prisoner is indigent. *Id.* § 47–1–59. Furthermore, maltreatment, including the willful failure to furnish food, clothing, shelter, bathing facilities, or medical attention, when under a duty to do so, is punishable as a misdemeanor. *Id.* § 47–1–27.

Finally, the statutes contemplate some measure of citizen and judicial oversight of the county jails. At each term of the circuit court, the grand jury must make a personal inspection of the condition of the jail and its adequacy for the safe-keeping of the prisoners. The grand jury must inquire into the accommodation and health of the prisoners and report their findings to the court. *Id.* §§ 13–5–55, 47–1–31. Once a jail becomes insufficient for the accommodation of additional prisoners, the judiciary is under an obligation to order the removal of new prisoners to the jail of another county, to be kept there until the appropriate court tries the accused. *Id.* § 47–3–1 (1978 Supp.). In addition, upon the petition of the state attorney general, a district attorney, or an interested private person, the state circuit courts may, through the writ of mandamus, order a public officer "to do or not to do an act the performance or omission of which the law specially enjoins as a duty resulting from an office, trust, or station, where there is not a plain, adequate, and speedy remedy in the ordinary course of law." *Id.* § 11–41–1.

This points up the fact that Mississippi does have a statutorily articulated policy which commands humane treatment for the county jail prisoners. Detailed provisions for the enforcement of this policy have been hereinabove described. State officials and interested private persons may invoke the aid of the courts for the enforcement of this policy. For infractions, a prisoner may sue for damages in the state courts.

The general practice, however, is that aggrieved prisoners resort to the federal courts, which can have jurisdiction only in those cases involving a denial of rights guaranteed by the federal Constitution. Such is the case we now have before us,

with some pendent state claims tagging along.

## THE JACKSON COUNTY JAIL

The Jackson County jail involved in this litigation is located in downtown Pascagoula, Mississippi. For the most part, it occupied the top floor of the four-story Jackson County courthouse. The building stands on one corner of a busy intersection, and there is little unused space on the courthouse lot. A church is situated across the street and a number of small businesses are located in the immediate vicinity. The courthouse and jail, constructed of concrete and steel, were completed in 1949. Presumably, the jail was built atop the courthouse for security reasons, since the sheriff's office, the docket room, and the radio center are all located on the first floor. On the first floor there is also one cell, which, until it was recently designated as the cell for the two kitchen trusties, was used as a "holding cell". The kitchen and the sheriff's apartment[6] are located on the third floor.

The jail occupies the entire fourth floor and can be reached either by stairs or by elevator. The north half of the jail is comprised of two "bull pens" and two maximum security cells. The east bull pen contains five six-bunk cells and a day room; the west, three six-bunk cells and a day room.[7] A narrow, enclosed safety vestibule connects each cell with the day room in each bull pen. The two maximum security cells formerly were cells within one bull pen but are now isolated from that bull pen; each cell contains three bunks.[8] A corridor some three feet wide separates the cells and the bull pens from the walls of the jail and is used for inspection and visitation.

The two halves of the jail are separated by a hallway about six feet in width. Four

6. Sheriff Diamond and his family lived in that apartment during his term in office. Sheriff Ledbetter, the incumbent, has chosen not to occupy it.

7. Each bull pen cell measures 7'1" × 12'9", or approximately 90 square feet, and is equipped with a lavatory, shower and toilet. Each day

room measures 16' × 12'9", or 204 square feet, and is equipped with several metal tables affixed to the floor, a lavatory, a shower, and a toilet.

8. These two cells are slightly larger than the bull pen cells and have approximately 100

"line cells" [9] and a large maximum security cell [10] occupy the southeast quarter of the jail and are separated from the walls by a narrow corridor, just as the bull pen cells are. Yet another corridor separates these five cells from the rooms in the southwest quarter of the jail. These rooms include the trusty room (which contains two bunks and has been used at times for attorney-client consultation), storage rooms, the elevator shaft and vestibule, and two "padded cells".[11]

An exhibit admitted at trial indicated that between September 26, 1973, and January 28, 1977 (3¼ years), a total of 8,580 persons, 6,864 of whom were pretrial detainees, spent some time in the jail. That same exhibit indicated that the average length of detention of those awaiting trial was 28 days. Other testimony indicated that the average stay was 28 days. If correct, this would mean that, on average, the jail contained nearly 200 prisoners every day throughout that period.[12] *These figures are obviously in error and cannot be credited.* It would be more accurate to say that in forty months 8,580 persons spent some time in the jail; that some of these stayed for only a brief time (as when bond was immediately furnished); that the overall average length of stay was probably less than ten days; and that the average pretrial detainee who was unable or unwilling to post bond may have stayed in the jail for 28 days, or more. The record does not disclose how many prisoners fell into this group.

The citizens and public officials of Jackson County have not allowed the crowded conditions of the jail to go without notice or remedy. As early as 1970 or 1971, the Board of Supervisors began planning the construction of a new jail. They understood that the present location atop the courthouse in downtown Pascagoula was inadequate. The county owned some land *away from the downtown area* which would be ideal for a new jail, leaving plenty of space for expansion, but the Supervisors needed additional funds for a new jail. Accordingly, they proposed a bond issue in the amount of $800,000, and the voters approved that bond issue.[13] Thus, nearly three years before this suit was initiated, and nearly two years before Chief Judge Keady of the Northern District of Mississippi first held many of the conditions at Parchman to be unconstitutional, citizens and public officials in Jackson County recognized the problems and set in motion the machinery which would correct them.

The Board of Supervisors decided that the most pressing need was for a new juvenile detention facility. At that time, juveniles were held in the county jail, and all public officials agreed that arrangement was undesirable.[14] With the support of civic leaders, the Board of Supervisors earmarked half of the $800,000 bond issue for the juvenile facility and then obtained

square feet of space. Each cell also has a lavatory, shower and toilet.

9. Each line cell contains four bunks, lavatory, shower, toilet, and metal desk. They measure $9'3'' \times 12'6''$, or approximately 115 square feet.

10. This cell contains two bunks, a table, a lavatory, a shower, and a toilet. We estimate that it has about 150 square feet of space.

11. Each padded cell is $6'6'' \times 6'$, or 39 square feet. Neither cell has a bunk or any other furnishings, save a small hole in the middle of the floor which was apparently designed to serve as a urinal.

12. 8580 prisoners $\times$ 28 days = 240,240 prisoner-days. 240,240 prisoner-days ÷ 1219 days = 197 prisoners.

13. The exact date of that bond issue does not appear in the record, but there seems to be a distinct possibility that the local newspaper, the Mississippi Press, may have played a key role in mobilizing public opinion. That paper ran a series of articles in 1971, complete with photographs, on the jail conditions, which were generally portrayed as deplorable. Shortly after Sheriff Diamond took office in January 1972, the jail improved enormously both in appearance and operation, and the newspaper ran a "before and after" series to demonstrate the progress which had been made.

14. One of the most important backers of the proposal to construct the juvenile detention facility first was Youth Court Judge Watts, whose name the new facility now bears.

matching funds from the federal government. Shortly after Sheriff Diamond took office in 1972, the county started the actual construction work on the juvenile facility and completed the building in 1975. Since then, the county has detained juveniles in the jail only if the Youth Court certifies them for treatment as adult offenders.

The Board of Supervisors then focused their energies on a new jail. In order to obtain federal funding, the Board had to run the gauntlet of a veritable maze of red tape, not the least of which was the requirement for an extensive study, which eventually cost the county $26,000. The architect who designed the building testified to the extensive discussions and coordination which took place and of the active participation and constructive suggestions of the county officials. The architect thoroughly described the new facility and placed particular emphasis on pre-stressed concrete construction, which entails considerable cost savings through the mass production of modular cells of identical design. According to him, the new economical design has vast possibilities as more governmental entities move to upgrade and modernize jails and prisons.[15]

The new jail, located on a 9.5 acre plot of land valued at $150,000, will have 79 one-bunk cells, *each of which will have at least 80 square feet of living space.* In addition, each prisoner will have access to a day room. The eight cells designated for women open to a common day room and are physically separated from the cells designated for men. There are two four-cell maximum security units and eight medium security cells, half of which are four-cell and half five-cell. There are four padded cells and three holding cells, as well as a drunk tank, which can hold up to twenty people on a temporary basis. The twenty minimum security cells open to a large day room, and the minimum security prisoners will use community shower and toilet facilities similar to those commonly found in military barracks and college dormitories (except for the specially designed equipment). The jail will have a large kitchen facility, office space for the jailers, and a combination booking and radio control room for the sheriff's department. In addition, a large visiting area will have individual booths to insure privacy. If the facility proves inadequate to handle the county's prisoners, the one-story jail is designed for easy, rapid expansion. Additional pods and modular cells can be readily put into position.

In addition to the juvenile detention center and the new jail, the county has voluntarily undertaken several other significant programs to alleviate the crowded conditions in the present jail. Several years ago, Sheriff Diamond convinced the local judges to begin a work release program for Jackson County prisoners. That program emphasized vocational education. There has been a substantial increase in the percentage of prisoners released on bond rather than held for trial. Most recently, Jackson County instituted the first restitution center in the State. This program, which will allow county prisoners sentenced to Parchman to make restitution to their victims in lieu of serving time in the penitentiary, began July 1, 1977, with the active assistance and support of the Mississippi Department of Corrections.

These are the basic facts surrounding efforts in Jackson County to treat prisoners in a lawful manner. With this background, we proceed to the merits of this appeal.

## THE DISPOSITION OF THIS CASE BY THE DISTRICT COURT

At the conclusion of the proceedings below, the District Judge issued a memorandum containing his findings of fact and conclusions of law. He denied relief on most of the plaintiffs' claims, but issued an injunction which required the defendants to complete the new jail before September 15,

---

15. Cf. A. Rand, The Fountainhead (architect Howard Roark designs modular low-income housing at substantial cost savings).

1978,[16] to cease receiving "persons charged with misdemeanors by any municipalities", to post a list of prisoner rights drafted by the court,[17] and to prevent any prisoner from sleeping on a mattress on the floor, either of his own volition or because of the crowded conditions in the jail.

■ These findings of fact are, of course, to be reviewed under the mandate of Rule 52, Federal Rules of Civil Procedure. They are not to be set aside unless clearly erroneous. As this rule has continuously been construed, the trial court's findings of fact may be denominated clearly erroneous only when "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766; *Ealy v. Littlejohn*, 5 Cir., 1978, 569 F.2d 219, 229 n. 30.

■ The major legal grounds for relief are founded on 42 U.S.C. § 1983 and a pendent state claim for damages. The federal statute protects all persons from "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws", if those deprivations are caused by persons who are acting under color of state law. Pendent claims exist by force of state law and the federal courts may entertain them in the interest of judicial economy. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Miller v. Carson*, 5 Cir., 1977, 563 F.2d 757, 760–62. With nothing more, the mere violation of state law by a state official is not a violation of a federal right, and the federal courts would lack jurisdiction to entertain such a claim. If, however, under color of state law, someone violates a "specific constitutional guarantee", then 42 U.S.C. § 1983 becomes applicable. *Paul v. Davis*, 424 U.S. 693, 700, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

At this stage of the litigation, plaintiffs seriously allege violations of only the First, Sixth, Eighth, and Fourteenth Amendments.

### Segregated Facilities

■ Except where "the necessities of prison security and discipline" require oth-

---

**16.** This case was orally argued on October 18, 1978, and counsel for defendants informed this Court at that time that the new jail had not been completed. We are now informed, however, that the new jail, after extensive training of jail personnel, as required by federal regulations when a federal grant is received, is now in use.

No effort has been made to initiate contempt proceedings to enforce the District Court's injunctive deadline. We do not reach the validity of that order.

**17.** The complete text of that list is as follows:

*PRISONER RIGHTS*

"Prisoners are entitled to adequate and proper medical care and attention at all times.

"Prisoners have the right to reasonable visitation by members of their family, relatives and attorneys at such times and under such circumstances and conditions as the Sheriff shall impose.

"Prisoners may serve as trusties, but shall not be assigned any duties other than custodial and kitchen assistance.

"Prisoners shall not be segregated on the basis of race and requests for transfer or assignment by prisoners to other cells which are not based on sound reason other than race will be denied.

"Prisoners are entitled to a proper diet under sanitary conditions at mealtimes.

"Prisoners have the right to uncensored communications subject to the right of the Sheriff or jailer to intercept any communication deemed necessary to his safety, the security of the jail or the safe keeping of the prisoners. No major discipline may be administered without disciplinary proceedings, which shall be conducted in accordance with prisoner fairness and due process; however, a trial is not contemplated. No hearing is required for minor discipline such as limiting or restricting visitation, canteen privileges and the like.

"Prisoners are entitled to reasonable protection against other prisoners and the Sheriff and jailer may shift or reassign prisoners to avoid trouble.

"Prisoners are not allowed, and may not be required, to sleep on the floor at any time.

"Prisoners who are pretrial detainees shall not be placed with convicted persons, except where space requirements, safety of the prisoner, peace and order of the jail and security of the jail require it.

"Prisoners have a claim for violation of the above rights shall have the right to take same, through their legal counsel, and have their case considered and adjudged by a United States Magistrate.

"BY ORDER OF THE COURT: December 6, 1977"

erwise, racial segregation within prisons is unconstitutional, *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Lee v. Washington,* 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). The trial judge found as a fact that "prisoners are not assigned to cells on the basis of race and the Jackson County jail is integrated, both in cells and in the bull pen areas". This finding certainly is not clearly erroneous with respect to the line cells, since a number of prisoners and officials testified that the line cells were integrated. We are left with the "firm and definite impression", however, that the judge was mistaken with respect to the two bull pens. Many prisoners testified that they were incarcerated in a bull pen which was either all-white or all-black. Although the bull pens were occasionally referred to in the testimony of prisoners and officials as "east" or "west", these respective bull pens were most often referred to as "white" and "black". Indeed, Plaintiffs' Exhibit 61, the floor plan of the jail supplied by the defendants in response to interrogatories, clearly denominated the large bull pen as "white" and the small bull pen as "colored". When these bull pens deviated from the pattern of segregation, that deviation was only temporary. We therefore conclude that according to the evidence the bull pens were unconstitutionally segregated along racial lines.

■ The defendants contend that they were not responsible for this racial segregation because each new inmate was given the freedom to choose which bull pen he wished to occupy. Ordinarily, prison officials assign prisoners to specific cells as the result of some reasonable classification system, and it appears that the officials of the Jackson County jail did assign prisoners to the line cells, although the propriety of their classification system was challenged in this case. In the inherently coercive setting of a jail, it is evident to us that the withdrawal of decision-making by the public

officials for only part of the jail amounts to impermissible racial segregation of prisoners.[18] *See Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

On remand, the District Court should enjoin the defendants from operating a jail segregated along racial lines. This, however, should not be a problem since the new jail is now open for single cell occupancy.

*Space Standards for Penitentiary Inmates*

Space standards for penitentiaries were extensively considered and decided in *Gates v. Collier,* 390 F.Supp. 482, 486, *affirmed,* 548 F.2d 1241 (50 sq. ft. per convict at Parchman); *Williams v. Edwards,* 5 Cir., 1977, 547 F.2d 1206, 1215 (80 sq. ft. at Louisiana penitentiary remanded for reconsideration). See, also, *Newman v. State of Alabama,* 5 Cir., 1977, 559 F.2d 283, 288, *reversed in part as to proper parties to the litigation,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (Alabama prison system), in which it was said that there is no constitutional requirement that prisoners be housed in individual cells; 60 sq. ft. requirement per prisoner remanded for further consideration.

*Space for Jail Inmates*

In *Miller v. Carson,* 5 Cir., 1977, 563 F.2d 741, we had before us the Jacksonville, Florida jail. Conditions there were exceedingly worse than those prevailing in Jackson County, exacerbated by a customary prisoner load generally 100 in excess of design capacity. The situation was described as "shoulder-to-shoulder housing", 563 F.2d at 745. The district court directed a return to "designed capacity", but we noted that "designed capacity" is a "tool", not the *sine qua non,* for determining constitutional capacity, 563 F.2d at 752, n. 18. We did not undertake to lay down any *per se* "square

---

18. The State of Mississippi long required racial segregation in the county and municipal jails, as well as in the state penitentiary. Miss.Code Ann. §§ 3374–135, 4259, 7913, 7965, 7971 (1942). These requirements were all deleted as of April 29, 1968. 1968 Miss. Laws ch. 552. The Supreme Court decided *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212, on March 11, 1968.

foot per prisoner" rule as to constitutional standards for prisoner space in local jails.

*Outdoor Exercise*

Our cases have never held that convicted prisoners have a constitutional right to outdoor exercise. *See, e. g., Miller v. Carson,* 563 F.2d at 751.

As to pretrial detainees, *Miller* held that they may not be *continuously incarcerated* in an institution *designed to punish,* where outdoor recreation is reasonably possible. This does not reach so far as to hold that every pretrial detainee in every jail is automatically entitled as a matter of constitutional right to outdoor exercise. In *Miller* ninety per cent of the prisoners in the over-stuffed Jacksonville jail never left their jail blocks. The conditions in the jail were "uncivilized". We simply said, 563 F.2d at 741, that the district court did not abuse its discretion in ordering jail authorities "to work toward" a program of daily outdoor recreation for pretrial detainees who had been continuously incarcerated.

In *Smith v. Sullivan,* 5 Cir., 1977, 553 F.2d 373, 379, Texas state law required outdoor exercise for one hour a day, three days a week, if weather and facilities permit it. We noted that the requirements promulgated by the district court required no more than that already commanded by state law.

■■■ Despite the foregoing exceptions, efforts have sometimes succeeded at the trial level to enforce outdoor recreational facilities for pretrial detainees in all jails as a routine constitutional right. The argument has been, and is, that outdoor exercise is essential to health. The constitutional criterion in matters of physical health is that the jailer must not be deliberately indifferent to the serious needs of his prisoners, *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Conceding that it may be that protracted confinement without outdoor exercise at some point may become seriously detrimental to health, there was no evidence from qualified physicians on this facet of the Jackson County jail case.

If at some point outdoor exercise becomes a serious health need, an unsettled question in the absence of appropriate medical proof, it seems odd that the courts have uniformly held that convicts, serving much longer terms than those ordinarily encountered in jail, have no constitutional right to outdoor exercise. We do not here hold that no pretrial detainee is ever entitled to outdoor exercise. We do hold that the evidence in the case now under appeal wholly failed to make out a need of constitutional proportions.

We further point out that a jailer may provide indoor space for a reasonable amount of physical exercise for pretrial detainees who desire it. This may well be a satisfactory alternative to outdoor facilities where there are none available, but we express no opinion on the subject in the absence of satisfactory medical proof specifically addressing the issue.

*Visitation Rights*

■■■ While penal institutions allow visitation rights in some form or another, convicted criminals do not have a constitutional right to such visitation, except for their legal counsel, *McCray v. Sullivan,* 5 Cir., 1975, 509 F.2d 1332, 1334; *Newman v. State of Alabama,* 5 Cir., 1977, 559 F.2d 283, 291.

■■■ Pretrial detainees do have a constitutional right to reasonable visitation, although this does not necessarily include *contact* visitation, *Miller v. Carson, supra,* 563 F.2d 748, 749. Detainee visitation must yield, where necessary, to the need to preserve institutional security, such as the prevention of weapon or contraband smuggling.

■■■ In the absence of such overpowering considerations as a threat to jail security, if a jailer were to refuse to allow the *ordinary* detainee any visitation privileges, or if he were to lay down arbitrary or capricious limitations on the privilege, such conduct would be unconstitutional, *Procunier v. Martinez,* 416 U.S. 396, 411, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The true rule is that the jailer must decide how many

hours a week visits are feasible, considering the physical limitations of the jail and the reasonable internal and external needs of the facility, *see Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Visitation privileges for ordinary detainees should be set forth in written rules in order that the detainees may understand them and so that the courts may have a definite basis for review in the face of claimed arbitrariness and capriciousness.

We note in passing that the First Circuit has held that a pretrial detainee does not have a constitutional right to contact visitation, *Feeley v. Sampson,* 1 Cir., 1978, 570 F.2d 364, 373. The Second Circuit, over dissent, has held that all pretrial detainees except those classified as presenting an intolerable security risk are entitled to contact visits [kiss his wife, shake hands with a friend, fondle a child], *Marcera v. Chinlund,* 2 Cir., 1979, 595 F.2d 1231.

### Basic Needs—Fundamental Interests Where Physical Facilities Are Not a Factor

### Medical Attention

The Supreme Court has recently held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment". And, such indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed", *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

■ Under Mississippi law, all persons held in county jails have a right to medical attention, Miss.Code Ann. § 47–1–57 (1972).

### Prison Food

■ The Constitution requires only that prisoners be furnished reasonably adequate food, *Newman v. Alabama, supra.* In this context, the courts have not specifically defined "reasonably adequate", perhaps be-

cause those of normal experience and average intelligence need no court to tell them when that situation does not exist. As a matter of fact, Mississippi law requires that prisoners shall have "daily wholesome and sufficient food and drink", Miss.Code Ann. § 19–25–71 (1972).

### Prison Mail

■ The recent case of *Guajardo v. Estelle,* 5 Cir., 1978, 580 F.2d 748, is dispositive of plaintiffs' claims of a right to uncensored general correspondence. Although that case dealt solely with the rights of convicts, the holdings are also applicable to pretrial detainees because in either instance the interests at stake stem variously from the First Amendment and from the "fundamental constitutional right of access to the courts", *see Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *and not from the Eighth Amendment.*

■ Under *Guajardo,* prison officials may constitutionally censor incoming and outgoing *general correspondence.* No numerical limitations may be placed upon prisoner correspondence, but jail officials may employ a "negative mail list" to eliminate any prisoner correspondence with those on the outside who affirmatively indicate that they do not wish to receive correspondence from a particular prisoner. Officials may not require the prior approval of the names of individuals with whom prisoners may correspond. Finally, letters which concern plans for violation of prison rules or which contain a graphic presentation of sexual behavior that is in violation of the law may be withheld.

■ Outgoing mail to be licensed attorneys, courts, and court officials must be sent unopened, and incoming mail from such sources may be opened only in the presence of the inmate recipient if considered necessary to determine authenticity or to inspect for contraband. Prisoners may be required to submit the names of attorneys reasonably in advance of proposed mailings so that whether the named attorney is licensed may be ascertained.

Prisoners have the same general rights as to media mail.

■ The sending of packages to inmates may be prohibited.

### Classification of Convicts

■ The Constitution does not expressly require states to develop prisoner classification plans for the incarceration of convicted criminals. In the past, we have approved district court orders that require *state prisons* to develop classification systems, but those orders were not predicated on an Eighth Amendment right to classification. They were used as remedies employed to eradicate abuses that were themselves unconstitutional. For example, when prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners, and the level of violence becomes so high as to constitute cruel and unusual punishment under the Eighth Amendment, federal courts have broad authority to eradicate such conditions and may order the development of a classification system as part of the remedy. *See, e. g., Newman v. State of Alabama,* 5 Cir., 1977, 559 F.2d 283, 291, *reversed in part sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *McCray v. Sullivan,* 5 Cir., 1975, 509 F.2d 1332, 1334. The record in this case is insufficient to support mandatory classification for convicts under the Eighth Amendment.

■ Nor does the due process clause grant the convicts housed at the Jackson County jail any right to a classification system. A convict may claim the protection of the due process clause only if the state deprives him of a property or liberty interest that is a legal entitlement under state or federal law, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), the Supreme Court said that prison classification is a matter delegated by Congress to the discretion of federal prison officials, and thus implicates "no legitimate statutory or constitutional entitlement sufficient to invoke due process", 429 U.S. at 88 n. 9, 97 S.Ct. at 279. In the state prison context, convicts have no due process right to any classification system beyond that mandated by state law. We have often emphasized that classification is a matter relegated to the discretion of prison officials. *See, e. g., Newman v. State of Alabama, supra,* 559 F.2d 283, 287; *Jones v. United States,* 5 Cir., 1976, 534 F.2d 53, *cert. denied,* 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976). In the absence of some entitlement having its genesis in state law, no due process right to classification exists for convicted state prisoners.

■ There is a recently enacted Mississippi statute providing for classification of prisoners, Miss.Code Ann. § 47–5–103 (1978 Supp.). The statute provides that offenders committed to the custody of the state correctional system must be classified as to "work duties, living quarters, educational, vocational or other rehabilitation programs, and privileges to be accorded the offender while in custody of the department". Section 47–5–110 of the Mississippi Code makes it clear that state offenders are committed to the jurisdiction of the state corrections department, not to a particular institution or facility, and it authorizes transfers of state prisoners back and forth between local facilities and the state's maximum security facility at Parchman. The statutory scheme obviously does not entitle any given inmate to any specific classification; it does not create any entitlements to particular work duties, living quarters or vocational training. A prisoner is simply entitled to be told in advance what his situation will be as to such things as work duties, living quarters and rehabilitative programs, and the statute provides that only the classification committee may permanently alter his status. No prisoner can complain under the statute if he is assigned to a local facility rather than Parchman, and the statute obviously does not dictate that any particular treatment be accorded prisoners once they are classified for housing at local facilities. In sum, the convicted state prisoners at the Jackson County jail, as against local offi-

cials, have no due process right to a classification system within the jail. If the state penal authorities were parties to this litigation we would consider that aspect of the case.

*Classification of Pretrial Detainees*

■ The due process rights of pretrial detainees as to some form of simple classification presents a different analysis. Those in jail awaiting trial have not been convicted of an offense and have not lost the constitutionally guaranteed liberty rights that pertain in the absence of a conviction. Some are detained for short periods pending a preliminary hearing. Others have had their hearings and it has been determined that there is probable cause to believe that they are guilty of violations of the law. Not having been convicted, pretrial detainees are all on the same footing and, in the absence of some special circumstance, are entitled to no different treatment than that accorded to others in the same class.

For example, however, as Judge Campbell wrote in *Feeley v. Sampson,* 1 Cir., 1978, 570 F.2d 364, 371, "A detainee with a notorious record as a bank robber may not be entitled to as lenient security conditions as someone serving a misdemeanor sentence".

In *Miller v. Carson, supra,* we held that an incarcerated pretrial detainee has a limited liberty interest to the extent of avoiding *unnecessary* or *unprotected* contact with prisoners known to be violent, or disturbed or infected with a contagious disease.

Of course, the security of the jail, the interdiction of weapons and contraband, and the like, are paramount considerations in any jail operation.

■ As to pretrial detainees, it seems perfectly obvious, especially in small jails with a limited number of prisoners, that the concept of classification for prisoners should be confined to a very limited spectrum. Consequently, we hold that the Constitution does not require elaborate prisoner classification at the jail level. The Supreme Court has held that even at the penitentiary level prisoner classification is confided to the sound discretion of prison officials, under state law. It is only when the officials fail to protect prisoners from homosexual attacks, personal violence, or unnecessary contact with the contagiously ill that the federal courts are warranted in entering the classification picture, *McCray v. Sullivan,* 5 Cir., 1975, 509 F.2d 1332.

We should think it would ordinarily be sufficient if jailers in county jails would promulgate, maintain, and adhere to a policy which protects pretrial detainees from violent, disturbed, and contagiously ill individuals as far as reasonably possible. Such a policy may be cast in terms of classification.

*PROTECTION and SECURITY*

The plaintiffs claimed that they had been denied their Eighth Amendment right to protection and security, and some of the damage claims rest upon these grounds.

In this connection the Fourth Circuit has said:

While occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment . . . confinement in a prison where violence and terror reign is actionable. A prisoner has a right . . . to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates . . . .

*Woodhous v. Commonwealth of Virginia,* 4 Cir., 1973, 487 F.2d 889, 890.

This was reaffirmed in *Hite v. Leeke,* 4 Cir., 1977, 564 F.2d 670, wherein it was said that a prisoner must prove "constant threats" or "frequent physical abuse".

In a case in which a prisoner alleged that officials failed to protect him from attacks and then denied him medical aid for six days, the Third Circuit has said:

To establish a constitutional violation, the indifference must be deliberate and the actions intentional. Moreover, not every injury or illness invokes the constitutional protection—only those that are

"serious" have that effect. Neglect, carelessness or malpractice is more properly the subject of a tort action in the state courts.

*Hampton v. Holmesburg Prison Officials,* 3 Cir., 1976, 546 F.2d 1077, 1081.

In *Little v. Walker,* 7 Cir., 1977, 552 F.2d 193, where an inmate charged that he had been repeatedly subjected to assaults, in deprivation of his rights under the Eighth Amendment, the Seventh Circuit held that:

It has been both a settled and first principle of the Eighth Amendment . . that penal measures are constitutionally repugnant if they "are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or [if they] 'involve the unnecessary and wanton infliction of pain.'" *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251. Violent attacks and sexual assaults by inmates upon the plaintiff while in protective segregation are manifestly "inconsistent with contemporary standards of decency." *Id.* "Deliberate indifference" to these happenings "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* Moreover, in the highly publicized landmark case of *Holt v. Sarver,* 442 F.2d 304, 308 (8th Cir. 1971), it was held that under the Eighth Amendment prisoners are entitled to protection from the assaults of other prisoners. . . . On remand, if Little can show that he was deliberately deprived of constitutional rights while confined in cell-house B, he will be entitled to damages.

552 F.2d at 197, 198 (citations omitted).

### Disciplinary Proceedings in the Jail

■ The only discipline for infraction of the rules at the old jail was a loss of visitation privileges, not to exceed two weeks for any one violation. As a practical matter this may not be a very strong deterrent for one who is determined to violate the rules, but in the present state of the jurisprudence it is one of the very few left available to the jail authorities. As to convicted prisoners it has no constitutional underpinnings.

■ As to pretrial detainees, the matter can be handled very readily by according the inmate minimum procedural due process, that is, inform him of the violation with which he stands charged and give him an opportunity informally to demonstrate that he is not guilty.

■ After all, the prime purpose of a jail is to hold persons committed there according to law. "Apprehension is insufficient if there is no detention", *Bryan v. Jones, supra,* (Brown, Chief Judge, concurring), 530 F.2d at 1217. The Constitution does not require that jailers perform this duty in the midst of violence, disorder, and infractions of prison rules designed for the orderly operation of the institution. In *Wolff v. McDonnell,* 418 U.S. 539, at 572, n. 19, 94 S.Ct. 2963, at 2982, 41 L.Ed.2d 935, the Supreme Court said that it was not suggesting "that the procedures required . . . for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges". To hold that the temporary loss of visitation privileges requires a full-blown due process hearing would place the Due Process Clause "astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges", *Meachum v. Fano, supra.* See, also, *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

### Our Disposition of the Findings of the District Court, Applying the Clearly Erroneous Standard.

■ The evidence did not establish that the physical facilities at the old jail were "unfit for human habitation under any modern concept of decency".[19]

19. Among other things, plaintiffs complained of substandard housekeeping and maintenance, cockroach infestation, the accumulation of garbage in cells, leaking showers, the utilization of the two padded cells, mattresses without sheets or bed linen, unclean food trays, inadequate

**1018**

There was no necessity for injunctive relief as to adequate fire safety, heating, cooling, ventilation, food, prison mail, or medical attention for the inmates of the old Jackson County jail.

 The plaintiffs' most credible allegation that the facilities are unconstitutional revolves around the sanitation of the jail. Because unsanitary conditions bear such a potential for the spread of disease and a consequent adverse impact on the health of prisoners, the testimony on this particular point has been carefully scrutinized. Again, however, it must be concluded that the evidence supports the fact findings of the judge and that those findings of fact are not clearly erroneous. The prisoners are responsible for cleaning their own cells, and the trusties assume responsibility when a prisoner is either unable or unwilling to clean up after himself. There was no evidence whatsoever of rodents in the jail. The jail minimizes the cockroach problem (which is common to all buildings on the Mississippi Gulf Coast) through a contract with a private company to spray the jail for insects once a month. Adequate disinfectants are available for the inmates and trusties. The county provides a blanket, mattress, mattress cover, and sheet for every prisoner. There was some testimony that these items were frequently filthy and unsanitary, but the county proved that it cleaned the blankets and sheets regularly and replaced the bedding items when necessary. The county purchased 718 new mattresses in the 18 months prior to trial, 150 blankets each year, and six dozen sheets every two to three months. The trusties operated the washer and dryer and made reasonable efforts to cope with the demands of the inmates for clean clothes and bedding. The trusties also regulated the water temperature for showers, and there was no evidence of systematic abuse of this function, although some prisoners did complain

that the water was not always heated to their exact liking. The kitchen itself was more than adequately sanitary, as the plaintiffs admit, and we cannot say that such facts as the possible reuse of plastic spoons, after washing, amount to a violation of the Constitution.

In short, the physical facilities and the maintenance of those facilities do not violate the Constitution, and no relief is warranted on this record.

 The crowded condition[20] in the old jail was another problem. All the parties, as well as the trial judge, agree that the old jail was crowded. We need not belabor this point because of the post-argument affidavits of responsible Jackson County officials that hereafter prisoners and detainees will be housed in single cells in the new jail, now open. The old jail will be used only for detention of persons waiting to post bail, and the like. Nevertheless, to avoid a repetition of past problems at the old jail future overcrowding should be prohibited.

 Unlike the situation in *Miller, supra,* where outdoor facilities were reasonably available without large expenditures of funds, there are no such facilities in the vicinity of the old Jackson County jail. Unless the courts were to order the erection of a large barbed wire fence around or near the county courthouse in downtown Pascagoula, or to order that prisoners be bussed to some out-of-the way location on a daily basis, neither of which we are prepared to do, there is no reasonably available facility for outdoor exercise.

Although we have approved lower court orders to provide outdoor recreation, *see, e. g., Newman v. State of Alabama,* 5 Cir., 1977, 559 F.2d 283, 291, we have done so in those cases only "because such facilities may play an important role in extirpating the effects of the [unconstitutional] conditions which indisputably prevailed" in those

lighting, inadequate ventilation, fire hazards, and lack of hygienic materials for both male and female prisoners.

20. According to our calculations, if every bunk in the jail were occupied, prisoners in the vari-

ous cells would have the following amounts of space (in square feet): east bull pen, 22; west bull pen, 26; small maximum security, 33; line cell, 29; large maximum security, 75; padded cell, 39. *See* notes 8, 9, 10, 11, & 12, *supra.*

prisons at the time that the District Judges fashioned the necessary remedies. *Id.* Where, as here, we cannot say that the totality of the circumstances in this jail amount to cruel and unusual punishment, we cannot hold that the lack of outdoor exercise alone constitutes such unconstitutional punishment.

Injunctive relief as to outdoor exercise at the old jail is unwarranted. As a matter of fact, such facilities are in place at the new jail.

 Under the circumstances prevailing in the old jail, leaving aside the issue of whether it is, or is not, constitutionally mandated, we do not find it practical to order that the visitation privileges for detainees be *contact* visitation. The jail has extremely limited facilities for visitation. *Official* visiting hours are limited to a brief period on Sundays, but there was testimony that jail officials often allowed visitation at other than regular hours. Children under 18 are not allowed to visit the fourth floor, but jailers do take prisoners down to the first floor to visit their children, if requested. There has been a serious problem with visitors smuggling contraband into the jail, despite the near lack of contact visitation and frequent, unannounced shakedowns of the cell areas. We have already alluded to the prison riot of 1976. In the face of these facts, we believe that the jail officials have demonstrated that the denial of contact visitation to pretrial detainees is indeed linked to the demands of institutional security.

The promulgation and distribution of reasonable non-contact visitation rules at the old jail will adequately relieve the visitation problems at that facility.

The Constitution does not expressly require states to develop prisoner classification plans for the incarceration of convicted criminals. Although we have approved district court orders that require *state prisons* to develop classification systems, those orders have not been predicated on an Eighth Amendment right to a classification system, but have been remedies employed to eradicate abuses that are otherwise unconstitutional.[21] For example, when prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners, and the level of violence becomes so high as to constitute cruel and unusual punishment under the Eighth Amendment, federal courts have broad authority to eradicate such conditions and may order the development of a classification system as part of the remedy. *See, e. g., Newman v. State of Alabama*, 5 Cir., 1977, 559 F.2d 283, 291, *rev'd in part sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *McCray v. Sullivan*, 5 Cir., 1975, 509 F.2d 1332, 1334.

The policies, in the nature of classification, set forth, *ante* (p. 1015), should adequately protect the visitation privileges of prisoners in the old jail.

 On the matter of security and protection, we do not believe that the plaintiffs have established the required "deliberate indifference" on the part of the Jackson County jail officials. The jail officials have taken every possible precaution to guard against the introduction of weapons or objects from which weapons may be fashioned in the jail. They do not allow packages to

---

21. Although we are aware that other federal courts have seemingly found a constitutional right to a reasonable classification system in a local jail, the rationale of those cases has not always been entirely lucid. *See, e. g., Campbell v. McGruder*, 1978, 188 U.S.App.D.C. 258, 283–285, 302–307, 580 F.2d 521, 546–48, 565–70, *aff'g in part*, 416 F.Supp. 100, 105 (D.D.C.1975) (ordering the development of a classification system, including provisions for contact visitation, for pretrial detainees); *Jones v. Metzger*, 6 Cir. 1972, 456 F.2d 854, *aff'g Jones v. Wittenberg*, 323 F.Supp. 93; Id., 330 F.Supp. 707, 717 (N.D.Ohio 1971) (classification of prisoners and inmate programs); *Barnes v. Government of Virgin Islands*, 415 F.Supp. 1218, 1235 (D.V.I. 1976) (effective separation of detainees and convicts ordered); *Rhem v. Malcolm*, 371 F.Supp. 594, 617–20, 624 (S.D.N.Y.1974) (ordering the development of a classification system), *aff'd and remanded*, 2 Cir. 1974, 507 F.2d 333, 339–40 (remanded for purpose of refashioning remedy), *on remand*, 389 F.Supp. 964, 968 (S.D.N.Y.1975), *amended*, 396 F.Supp. 1195, 1201–02 (S.D.N.Y.1975), *aff'd*, 2 Cir. 1975, 527 F.2d 1041; *see also Rhem v. Malcolm*, 432 F.Supp. 769, 785–88 (S.D.N.Y.1977) (finding classification plan inadequate).

be sent to the inmates. They carefully inspect every prisoner and his clothing when he is incarcerated. They conduct frequent, unannounced shakedown inspections of every cell. They do not permit contact visitation, except in certain carefully controlled circumstances. The present sheriff has kept an officer on the floor of the jail at all times to guard against inmate violence. The sheriff's deputies are immediately available if reinforcements are needed. All of the allegations of injuries, save one, assert injuries at the hands of other prisoners and not at the hands of any jail officials. The sole exception was the allegation of Lowell Dean Mitchell, a white inmate who claimed that he was sprayed in the face with mace by a deputy when he refused to move to the black bull pen. There was no corroborating testimony, and Mitchell could not, or would not, identify the deputy who allegedly sprayed him. There was no allegation by Mitchell of a lingering injury, and the trial judge did not credit his testimony. In none of the other nine cases did the defendants actually participate in the alleged assaults, and there is no evidence that they knew of the potential for violence and, acting with that knowledge, abetted the assault through inaction. One trusty, Andrew Thomas, testified that there was never a fight or disturbance while he was a prisoner or trusty. On the other occasions when there were outbreaks of violence, the jail officials invariably responded immediately and took injured prisoners to the hospital when necessary. After minor scuffles, they generally tried to separate the combatants into different cells to ease the problems. In short, this record does not establish a pattern and practice of deliberate indifference to the security and protection of the prisoners, and it is therefore not necessary for us to order injunctive relief or to evaluate the qualified good faith immunity defense of the officials with respect to any damage claims that might be properly before us.

█ The plaintiffs also charged that the use of trusties in the Jackson County jail was unconstitutional. The record indicates that the trusties were used for relatively minor functions, such as helping to serve food and wash dishes, and that they did not have access to keys to the inmates' cells. Since 1976, a jailer has been on the jail floor at all times, and the trusties' duties have been reduced accordingly. The utilization of inmates as trusties in this jail has been a far cry from the utilization of trusties condemned in *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), aff'd, 5 Cir., 1974, 501 F.2d 1291; or *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 8 Cir. 1971, 442 F.2d 304. The trial judge's findings of fact are not clearly erroneous,[22] and we affirm the

22. "The court finds that trusties in the Jackson County jail are given duties which are custodial only. They neither administer nor enforce discipline or punishment.

"Trusties are selected based upon their behavior and attitude demonstrated while prisoners in the jail, and before becoming trusties, they are given a sort of apprenticeship.

"There are six to eight trusties in the Jackson County jail, two of who, at the time of the trial in June, were full-time kitchen employees, with health cards, residing in the former holding cell on the ground floor, which is the only cell on that floor. The kitchen trusties were placed in this cell due to their long working hours and the odd hours of their work.

"Except for the two trusties with health cards who are working in the kitchen, assisting Mrs. Grimsley and her staff, trusties do not prepare and serve food. Trusties assist in the distribution of food trays after they are delivered from the kitchen to the fourth floor jail.

"Trusties assist in distribution of linen, laundry call, laundering clothes and bed linens, cleaning and sweeping within the jail, handing out cleaning materials, and performing other custodial duties in the jail.

"Trusties are not provided keys, and they have nothing to do with supervision and discipline of prisoners. During the Diamond administration, trusties did serve to communicate prisoner requests and complaints made in the absence of the jailer, but in the Ledbetter administration, a jailer is on duty at all times and such requests can be communicated through a jailer.

"Trusties are accorded freedom of movement throughout the jail, but not beyond the jail. Trusties receive the same food as other prisoners, the same linen, cleaning and hygienic supplies. Trusty living quarters are the same as other prisoners, except for freedom of movement. Two trusties who work

denial of relief on this issue on the basis of those findings.

 Finally, plaintiffs assert that the disciplinary proceedings in the jail violate the Constitution because the rules are vague and because the procedures employed by the jail officials in disciplinary proceedings do not satisfy the demands of the Due Process Clause. Before analyzing this issue, we should note that we do not have before us a case in which an individual is complaining of a deprivation of a protected liberty or property interest without due process of law. In most such cases in which violations of procedural due process are asserted, if the appellate court finds that such violations actually occurred, the usual course is to remand for further proceedings. In actions brought under § 1983, in the absence of proof of actual injury, persons who are victorious on their claims of denial of procedural due process may recover only nominal damages. *Carey v. Piphus*, 435

U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Since the record does not reveal what individuals, if any, may have been denied due process, we cannot remand for further proceedings and we have no basis for awarding even nominal damages. Nevertheless, since this is a class action and since it is undisputed that at least some persons in the past violated the jail rules and were then denied some privileges, we believe that the issues are properly before us, that those issues have been sharpened through concrete adversity, and that they are ripe for resolution.

 The trial produced substantial testimony on the rules, procedures, and penalties imposed, and the trial judge carefully weighed that testimony. The important points of his findings [23] are that rules have been posted in all the jail cells; that under the previous sheriff the only sanctions imposed for violations of those rules were the loss of visitation privileges for short dura-

---

in the kitchen live in the former holding cell on the ground floor. The latter two have been allowed a television set in their cell, since they have special duties and are completely separate from the rest of the jail.

"Trusties assist in the delivery of packages, but trusties do not open and inspect packages or mail and do not deliver them out of the presence of the jailer.

"Trusties assist in the operation of the jail store, by delivering items purchased from the canteen. There is no evidence of any prisoner having paid a trusty for an item from the canteen and not having received the item.

"The role of the trusties in the Jackson County jail is custodial, and is not unreasonable or inappropriate."

23. In his memorandum the trial judge found that:

"The complaint alleges that there are no procedures or policies governing imposition of discipline, and that inmates upon whom discipline is imposed are not told of the misconduct with which they are charged, not given an opportunity to present their side before an impartial tribunal, not given an opportunity to present witnesses and evidence, not allowed to be represented by another inmate or staff employee, not entitled to confront accusers and cross examine witnesses, and not entitled to have a written record of the findings of facts and conclusions as to punishment.

"The Court finds that rules were prominently posted and prisoners made aware of them during the Diamond administration,

and Sheriff Ledbetter, after initially operating under Sheriff Diamond's rules, made and posted his own rules and made prisoners aware. The rules are read and explained to all incoming inmates and they are posted in the hall and in cells throughout the jail. The rules are in lay language, understandable by the average prisoner. There is no corporal or physical punishment or punishment detrimental to health, and such punishment as has been administered, has been minimum.

"Under Sheriff Diamond, punishment consisted only of loss of visitation for short durations and, on rare occasions, up to 24 hours in one of the small padded cells. No prisoner was given more than 24 hours in the padded cell.

"Since the beginning of Sheriff Ledbetter's administration in January, 1976, there has been no punishment at all by confinement in the padded cell, and the only punishment has been restriction of denial of visitation. In no case under Sheriff Ledbetter has denial of visitation exceeded two weeks, which was the period of time imposed following the December 20, 1976 riot.

"When visitation is restricted or denied, there is an investigation by the jailer or Sheriff into the facts surrounding an incident.

"No prisoner testified that he had sought to be represented prior to any punishment and was denied it, or that punishment was imposed without cause."

tions or, occasionally, placement in the padded cell for up to twenty four hours; and that since January 1976 the only administered sanction has been the loss of visitation privileges. In view of the fact that the padded cell has not been used for rule violators in nearly three years, and the new jail is now in operation, we believe it unnecessary to decide whether the use of solitary confinement for such brief periods is such a deprivation of liberty that it must be preceded by the panoply of procedures mandated by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

### The State Law Damage Claims

Our discussion of the federal constitutional claims included, at appropriate points, analyses of potential state law grounds for injunctive relief. We concluded that the plaintiff class is entitled to injunctive relief on some issues, but for the reasons to follow we conclude that they are entitled to no damages for violations of either state or federal law. First, our holdings that, with respect to certain issues, no relief is warranted on this record necessarily include holdings that neither injunctive relief nor an award of damages is warranted.

Second, we conclude that no damage claims are properly before us.

■■■■ Initially we had planned to analyze the facts surrounding the pendent state law claims of 10 inmates,[24] but a thorough examination of the record convinces us that these individual claims are not properly before us for decision. The claims of the only named plaintiff, Marvin Jones, were denied by the District Judge, and no appeal was perfected. There are no other named plaintiffs in this lawsuit, but, as we have held, Jones may continue to represent the interests of the class.

■■■■ The problem is to determine whether the District Judge certified a 23(b)(2) class, a 23(b)(3) class, or a combination of the two. If the class is only a 23(b)(2) class, it was not absolutely necessary to notify every member of the class who could be identified through reasonable effort, but, in accordance with the rule, the court could award only injunctive and declaratory relief. Therefore, the individual state law claims for damages would not have been cognizable in a 23(b)(2) class action.

Such claims would have been cognizable in a 23(b)(3) class action, however. For

24. As far as we are able to ascertain, the plaintiffs introduced proof concerning injuries inflicted upon Lowell Dean Mitchell, Darrell Glenn McGee, Anthony Miller, Eugene Darrell Ladnier, Donald Overstreet, Bobby Hughes, Robert Leclair, Larry Carver, Albert Johnson, and Walter Hoie. According to the evidence, all but one of these men sustained injuries at the hands of other inmates. In some cases the assaulter was not identified, and no inmate has been made a defendant in this suit. Mississippi law requires that a sheriff owes prisoners in his jail a duty of reasonable care. *Farmer v. State*, 224 Miss. 96, 79 So.2d 528 (1955). *See also Mississippi v. Durham*, 5 Cir. 1971, 444 F.2d 152; *Roberts v. Williams*, 5 Cir. 1972, 456 F.2d 819; *Anderson v. Nosser*, 5 Cir. 1971, 438 F.2d 183, *aff'd in part and modified in part*, 5 Cir. 1972, 456 F.2d 835 (en banc). We are unaware of any Mississippi cases which hold a sheriff liable for injuries to a prisoner directly caused by the assault of another prisoner, but we think it likely that Mississippi's courts, if presented with the question, would adopt the common law rule that a prison or jail official is not liable for injuries inflicted by one prisoner upon another in the absence of knowledge of some unusual danger, of reason to anticipate such danger, of malice, or of actual participation in inflicting the injury. *See generally* Annot., 41 A.L.R.3d 1021 (1972). In any event, whatever Mississippi law is, the proof would necessarily be individualized, and the trial court would also have to analyze the facts surrounding each particular incident of violence in order to properly evaluate the qualified good faith immunity defenses of the prison or jail officials. *See Bogard v. Cook*, 5 Cir. 1978, 586 F.2d 399. Because of the importance of the individualized nature of the proof and the good faith immunity defense, it might be difficult for us to conclude that such claims could be tried as a (b)(3) class action. That rule requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and it would seem that this requirement might not be met. In addition, if there are only 10 identifiable prisoners who have a colorable state law claim for damages, it can hardly be said that joinder is impracticable. Fed.R.Civ.P. 23(a)(1). In view of our conclusion that there is no 23(b)(3) class before us, we do not decide such questions.

such a class, the plaintiffs would have been responsible for complying with Rule 23(c)(2) and insuring that the court directed "to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R.Civ.P. 23(c)(2). There were at least 8580 members of the class which was finally certified, and it seems likely that the addresses of those people could have been identified through the sheriff's records or the local telephone directory. This notice is mandatory, and the costs of that notice must be borne by the plaintiffs. "There is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). Without valid notice and an opportunity to opt out of the class, there can be no *res judicata* effect given to judicial determinations of the claims of unrepresented parties. In view of the *res judicata* problems which arose in a recent prisoner class action suit in this Circuit, *see Bogard v. Cook*, 5 Cir., 1978, 586 F.2d 399, we have carefully scrutinized this record to determine the *res judicata* effects of our decision in this case.

In their complaint the plaintiffs apparently sought the certification of both a (b)(2) and a (b)(3) class,[25] but there is no indication in the certification order as to what type of class action the Judge had certified. There is also no indication in the record that the class members were properly notified, and we cannot assume that they were. Therefore, we have only a 23(b)(2) class action before us. Since the only 10 prisoners as to whom proof was introduced on the state law damage claim are not named plaintiffs, any decision of those 10 claims would have no *res judicata* effect and we must therefore decline to decide these issues.

### Access to the Courts

The trial judge's findings of fact are especially pertinent here:

The court finds that competent and active public defenders, paid by the county, operate from offices in the Jackson County courthouse. The public defenders, as well as retained attorneys, generally have freedom of movement in and out of the Jackson County jail at times other than normal visiting hours. There is a small room on the fourth floor of the Jackson County jail, a part of the former trusty room, where attorneys and clients may meet behind closed doors, and, upon request, prisoners and their attorneys are given one of the rooms downstairs in the Sheriff's office for conferences.

Located in the Jackson County courthouse is the Jackson County Law Library, which was described as being second only to the Hinds County (Jackson) Law Library, among county law libraries in the state of Mississippi. Requests for law books by prisoners are transmitted to the public defenders, who, in turn, obtain the requested law books from the law library in the courthouse. Very few such requests have been made, but those which have been made have been honored.

This language tracks the language of both 23(b)(2) and (b)(3). Our earlier opinion in this case did not order the District Judge to certify either a (b)(2) or a (b)(3) class, but merely ordered him to conduct a full evidentiary hearing on the determination of the class. *See Jones v. Diamond*, 5 Cir. 1975, 519 F.2d 1090. It was not until after trial that the plaintiffs moved to amend their complaint to conform to the evidence by adding a pendent state law claim. Although we can only speculate, it would seem that this may have been a strategy devised to avoid the notice requirements of Rule 23(c)(2). If so, we cannot condone such tactics, and we caution parties and District Judges to be alert to such dodges.

---

25. The complaint states, *inter alia*, that:

Adjudication with respect to individual members of the classes would as a practical matter be dispositive of the interests of the other members not parties to the adjudication. The parties opposing the classes have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief to the classes as a whole. The questions of law or fact common to the members of the classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**1024**

■ Insofar as the judge concluded, based upon these findings, that pretrial detainees were not unconstitutionally prevented from seeking redress of their grievances in court, and they all have, if they wish it, appointed or retained counsel. Although we are concerned that the county may not have provided adequate space for attorney-client consultation at all times in the past, we think that the steps taken by the present administration are probably adequate, in light of the existing physical facilities, to safeguard the interests of the detainees in preparing defenses for their trials. We also note that the new jail will provide highly improved facilities for visitation and attorney-client consultation. Therefore, with respect to the pretrial detainees we think no further relief is warranted on this record.

*Prisoners Who Are Under Final Judgments of Conviction and Who Have Exhausted The Right of Direct Appeal*

Those prisoners who are under a final judgment of conviction for a penitentiary offense and whose direct appeals have been exhausted are in a different situation, however, to that of prisoners who up to that point have had the benefit of representation of counsel if they desired it. Had the state penal authorities been parties to this litigation we would have thought that the District Court adequately addressed this issue in the light of *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

That case clearly held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. *Bounds* dealt with the efforts of North Carolina to set up legal libraries for the use of the convicted criminals held in the 77 prison units scattered throughout the state. The rub presented by the instant case is the fact that *Bounds* is directly relevant only because the unconstitutional conditions at

Mississippi's sole penitentiary have required a federal court to impose a ceiling on the number of prisoners which the state may lawfully incarcerate at the existing facilities. As we explained earlier, newly convicted criminals are being temporarily held in county jails across the state, and it appears that in the Jackson County jail the convicts outnumber the detainees. *See* note 5 *supra*. Insofar as we know, the State of Mississippi has no organized program of providing "adequate assistance from persons trained in the law" to enable convicted prisoners to file habeas corpus petitions and civil rights actions. The State has established a law library at the Parchman penitentiary which is admittedly adequate. *See Stevenson v. Reed*, 391 F.Supp. 1375 (N.D.Miss.1975), *aff'd*, 5 Cir., 1976, 530 F.2d 1207, *cert. denied*, 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976). Therefore, if all convicted criminals were held at Parchman, the State would, in all likelihood, have fulfilled its obligation under *Bounds*.

■ Such is not the case, however, as to convicts held in the county jails pending ultimate transfer to Parchman. We do not know the content of the Jackson County law library but, in any event, those convicts have inadequate access to that library and therefore inadequate access to the courts, assuming that legal assistance is not otherwise provided. Prisoners do not have physical access to the library; one must request a particular book, and someone will then locate that volume for him. Even if indigent, uneducated convicts could know exactly what their legal claims were, it would simply be impossible for them to know what cases to look up to buttress their claims and where those cases could be found. It is small wonder that the trial judge found that "[v]ery few such requests have been made, . . . ."

■ It is the State which is responsible for the backlog of convicted criminals in the county jails. The convicts are state prisoners, not county prisoners. It is only fair that the State be required to meet its obligations under *Bounds*. Because the State

itself is the responsible party, we should not order these local defendants to implement a system which would comply with *Bounds.* Therefore, we affirm the denial of relief, but this action is taken without prejudice to the plaintiffs' right to bring suit against the appropriate state officials to secure compliance with *Bounds.*

### Costs and Attorney Fees

After a lengthy, careful perusal of the 1520 pages of trial transcript and the 270 pages of the record on appeal, we are dismayed by the manner in which this case proceeded through the court below. Although numerous objections to the admission of evidence were lodged during the trial, many of which were meritorious and could have been sustained upon appeal, neither party has pressed those objections upon appeal. Consequently, this Court does not, of its own motion, attempt to purge the record of all inadmissible evidence.

We are concerned, however, with the pattern and practice of counsel revealed in this record. The complaint was filed on August 13, 1973, and 123 interrogatories (not counting subquestions) were attached. This action was taken in spite of the local rule limiting interrogatories to 30 in number. No objection was raised, however, and the defendants dutifully filed their answers on September 26. New counsel then entered the case for the plaintiffs, and on June 6, 1974, a second set of interrogatories, consisting of 75 more questions (again not counting subquestions), was propounded to the defendants, who then moved to strike those interrogatories. After a hearing, the District Judge permitted the plaintiffs to file 75 more interrogatories and ordered the defendants to answer within 15 days. On July 30, 1974, 56 more interrogatories were filed, and they were answered in due course. On March 3, 1976, months after this Court rendered its decision in *Jones v. Diamond,* 5 Cir., 1975, 519 F.2d 1090, 48 more interrogatories (again omitting the extensive subquestions from the total) were propounded, and the defendants again objected. The record does not indicate that

the defendants moved for a protective order under Fed.R.Civ.P. 26(c); they only moved to strike the interrogatories. The District Court overruled the objection and ordered responses.

After these preliminary skirmishes were completed, with all the costs of this burdensome discovery apparently borne by the defendants, nothing happened until January 24, 1977, when the plaintiffs moved for a default judgment on the grounds that defendants had failed to file answers to the last set of interrogatories. The response to this motion was an assertion that the parties had been engaged in settlement negotiations and that it was defendants' understanding that plaintiffs were prepared to settle and therefore did not need answers to the interrogatories. With trial set for February 14, 1977, it was all too evident that neither party wished to settle, and the defendants promptly filed their answers.

Although none of the foregoing seems beyond the scope of the Federal Rules of Civil Procedure, it sets the stage for the gamesmanship and "trial by ambush" which followed. On February 11, 1977, the Friday before the trial, plaintiffs filed with the Court a Motion for Leave of Court to Have Expert Witnesses Inspect and Photograph the Jackson County Jail Facilities, a motion which was granted by the Court in an ex parte proceeding. This was contrary to the spirit, if not the letter, of Fed.R.Civ.P. 34, and should have been accomplished by counsel prior to that late date. Defendants objected to that procedure at trial, Tr. 2–3, but the objection was overruled, and they do not challenge it on appeal.

On February 14, the opening day of trial, a subpoena issued to the Singing River Hospital in Pascagoula ordering the production of vast amounts of medical records by the next day. When plaintiffs' counsel offered those records as evidence the next day, he admitted that he himself had not seen many of the records and did not know their contents. Tr. 420. Defendants objected to the admission of these records, largely on privacy considerations, but the records were eventually admitted. Again, no appeal

from that ruling has been taken. Also, on February 15, during a recess, a subpoena duces tecum was served on Sheriff Ledbetter to produce numerous documents regarding the management of the jail. In the heat of trial, such a request would seriously have impaired the ability of that defendant and his counsel, who represented all of the defendants, to prepare his own case. Such tactics cannot be condoned. Fortunately, this issue did not come to a head, since the District Judge was forced to continue the case due to other time commitments.

Finally, there is the matter of the rebuttal witnesses called by the plaintiffs. Two of these witnesses were inmates who testified primarily concerning alleged sexual assaults in the jail, and one witness was an attorney who testified about the lack of a room for private consultations with his client. Defendants objected on the grounds that this testimony should have been part of the case in chief. There is much merit to that argument, but no appeal has been taken. Defendants were then forced to bring two deputy sheriffs from Pascagoula to the Court in Biloxi to counter that testimony.

Since the plaintiffs encountered a total loss in the District Court, the question of costs and attorneys' fees was neither addressed nor decided in that tribunal.

It necessarily follows that we are in no position to intimate what ought to be done on this question. We shall remand the case to the District Court for findings and conclusions on this subject. In the interest of judicial economy, however, and in the hope that it will help avoid the necessity for any further appeals in this case, we offer the following general comment.

### Attorneys' Fees [26]

The propriety of awarding attorneys' fees in a suit such as this one was recognized by Congress in the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C., § 1988, which states:

> In any action or proceeding to enforce a provision of [§ 1983 and other statutes] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

As the statute makes clear, the first determination a court must make prior to assessing attorneys' fees is whether a party was a "prevailing party" within the meaning of the statute. Of course, if the plaintiffs did not "substantially prevail" in the litigation, an award of attorneys' fees, or costs, would be inappropriate. *See, e. g., Franklin v. Shields,* 4 Cir., 1977, 569 F.2d 784 (en banc), *cert. denied,* 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978).

6 Moore's Federal Practice ¶ 54.-70[4] at 1306, 1307 defines the terms as follows:

> In general, a party in whose favor judgment is rendered by the district court is the prevailing party in that court . . . Although a plaintiff may not sustain his entire claim, if judgment is rendered for him he is the prevailing party.

Such a rule is logically appealing. To hold that a plaintiff could not prevail for purposes of attorneys' fees and costs if he succeeded in recovering for fewer than half of the claims made in his complaint would be inconsistent with our liberal pleading rules and would penalize aggrieved parties for covering all bases at the initiation of the suit. Moreover, claims are not always— perhaps ever—of equal "weight" to the litigants themselves. The heart of the suit may be a prayer for injunctive relief, but the complaint may also seek damages on multiple counts amounting to a relatively insignificant sum. Certainly if the plaintiff secures his injunction, he has "prevailed", even if all damage claims were disallowed.

The courts have recognized this principle in determining attorneys' fees, but have tempered it with a detailed examina-

---

26. As a part of our consideration of this case, and at the special request of the Court, Judge Rubin has taken a close look at the matter of attorneys' fees and costs in cases of this type. Much of what follows on these subjects was authored by him. However, Judge Rubin does not agree with all of the conclusions herein expressed on this topic.

tion of the particular circumstances of each case, as is required under *Johnson v. Georgia Highway Express, Inc.,* 5 Cir., 1974, 488 F.2d 714. Thus, *the degree to which counsel prevailed in the lawsuit* has become a factor in determining the appropriate amount of attorneys' fees to be awarded. For an example of our approval of a reduction in an attorneys' fee in which the plaintiff obtained injunctive relief, see *Foster v. Boise-Cascade, Inc.,* 5 Cir., 1978, 577 F.2d 335, rehearing en banc denied.

 Some courts have stated this rule in shorthand form by saying that the award "should be proportionate to the extent to which the plaintiff prevails in the suit", *Williams v. General Foods Corporation,* 7 Cir., 1974, 492 F.2d 399, 409; *Batiste v. Furnco Construction Corporation,* 7 Cir., 1974, 503 F.2d 447, 451, *cert. denied,* 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975); *Schaeffer v. San Diego Yellow Cabs, Inc.,* 9 Cir., 1972, 462 F.2d 1002, 1008. Put in more general terms, "it is appropriate, in establishing a reasonable [attorneys'] fee, to take into account the net result of their efforts", *Souza v. Southworth,* 1 Cir., 1977, 564 F.2d 609, 614. The justice of this rule is readily apparent. Defendants should not have to pay attorneys' fees to have cases brought against them (which they have to defend at their cost) on charges which lack the merit of some basis in fact or in law.

In *Sweeney v. Board of Trustees of Keene State College,* 1 Cir., 1978, 569 F.2d 169, the plaintiff sued under Title VII, Equal Pay Act, Title IX, § 1983, and the Fourteenth Amendment, securing partial relief under Title VII. She was awarded attorneys' fees and costs in the amount of $17,766.56, only twenty per cent less than the amount claimed and proved. The Court noted, "A party who prevails in part may still be awarded attorneys' fees", *Id.* at 180, and held that the trial judge did not abuse his discretion in reducing the award to reflect the limited extent of plaintiff's success.

After partially reversing the trial court on the merits in *Walter v. Netherlands Mead N.V.,* 3 Cir., 1975, 514 F.2d 1130, the court remanded for reconsideration of attorneys' fees, suggesting at 1143, n. 29:

> In this case it would be particularly important to determine what portion of Walter's attorney's time was applied to the claims on which Walter has ultimately prevailed, and to grant only so much of the fees thus computed as are fair in relation to the amount of Walter's recovery on these claims . . .

And in *Marr v. Rife,* 6 Cir., 1974, 503 F.2d 735, 744, the court explained:

> To deny appellants any recovery for attorney fees when they were at least partially successful in their suit would, we believe, be inconsistent with the policy favoring the award of attorney fees. At the same time, it might indeed be unfair to impose all the attorney fees upon a single defendant when the suit involved numerous alleged violations by various defendants and only one was found to be meritorious. In such a case it might be the better rule to allow a plaintiff a proportionate amount of attorney fees to the extent that he prevailed in the suit.

In *McCormick v. Attala County Board of Education,* N.D.Miss., 1976, 424 F.Supp. 1382, 1388, a claim for attorneys' fees was reduced on the theory that plaintiff's counsel's "total out-of-court time claimed is not wholly compensable for the reason that a great deal of counsel's time was spent in seeking to develop an issue on which the plaintiff lost".

 Thus, in determining the proper amount of attorneys' fees, the trial court on remand in *Jones v. Diamond* should take into account, among other factors, the extent to which the plaintiffs have prevailed on appeal.

### Costs

 Under Rule 54(d), Federal Rules of Civil Procedure, "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs

. . . ." This, of course, does not mean that a party will be compensated for all expenses incurred, however unreasonable. Those expenses that are out of the ordinary or excessive in amount will be closely scrutinized by the court, *Farmer v. Arabian American Oil Company*, 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964).

It is for this reason that we have detailed, *ante*, the procedural history and the tactics used in this case on behalf of the plaintiffs.

Costs have therefore been almost routinely awarded in toto whenever a plaintiff has prevailed on any substantial part of his claim. Thus, in *Hostrop v. Board of Junior College District No. 515*, 7 Cir., 1975, 523 F.2d 569, a plaintiff who sued for wrongful termination under the First Amendment, Due Process Clause, and contractual guarantees, and recovered under procedural due process, was awarded his costs. In *Lewis v. Pennington*, 6 Cir., 1968, 400 F.2d 806, *cert. denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444, although the coal companies prevailed on only one of two grounds advanced, they were deemed "prevailing parties" and entitled to costs.

Before the adoption of the Federal Rules of Civil Procedure, the Supreme Court indicated that in suits at law, as opposed to equity, an award of costs to the prevailing party was a matter of course, and the court was without power to deny any part of the total. As the Court stated in *In re Peterson*, 253 U.S. 300, 318, 40 S.Ct. 543, 549, 64 L.Ed. 919 (1920):

It has also been generally held that this right to costs of the prevailing party in actions at law extends to the entire costs in the trial court, and that the court is without power to make an apportionment based upon the fact that the prevailing party has failed in part of his claims, or that for other reasons only a part or none of the costs should in fairness be allowed.

Today, however, it is recognized that a court has wider discretion over an award of costs. *See*, 10 Wright and Miller, Federal Practice and Procedure: Civil § 2667:

A party who has obtained some relief usually will be regarded as the prevailing party even though he has not sustained all of his claims, although in some cases of this type the court will apportion costs among the parties.

Other courts have rejected squarely any argument that costs should be apportioned according to the issues on which each party prevailed. In *K–2 Ski Company v. Head Ski Company, Inc.*, 9 Cir., 1974, 506 F.2d 471, the defendant contended that since the plaintiff had prevailed on only two of twelve allegations of violating trade secrets, the costs should be divided. The court held that the plaintiff was the prevailing party and was entitled to all costs.

This rule is for the benefit of the court. As explained in *Federal Deposit Insurance Corporation v. Fruit Growers Service Company*, E.D.Wash., 1941, 2 F.R.D. 131, 133, where the court refused to disallow witness fees for those witnesses who testified on an issue on which the plaintiff did not prevail:

It seems to me that if the Court is going to start deciding what witness fees will or will not be allowed according to whether the Court accepts the testimony of such witnesses, the Court would soon find itself spending as much time passing upon the taxation of costs as it does in reaching a conclusion in reference to the case itself.

We have no doubt that in this case plaintiffs should recover no costs incurred in late or dilatory tactics which contributed nothing to the appropriate resolution of the case, viewed as a whole and not in its separate parts.

Provision for the compensation of witnesses is made in 28 U.S.C., § 1821 which states:

A witness attending in any court of the United States . . . or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall receive $20 for each day's attendance and for the time necessarily occupied in going to and returning from the same, and 10 cents per mile for going from and returning to his place of residence.

The Fifth Circuit has repeatedly held that the statutory fees provided in § 1821 are exclusive, and a district court has no authority to tax costs for compensation to expert witnesses in excess of the statutory per diem, mileage and subsistence allowance where appropriate. *See, e. g., Gerber v. Stoltenberg,* 5 Cir., 1968, 394 F.2d 179; *Henning v. Lake Charles Harbor and Terminal District,* 5 Cir., 1968, 387 F.2d 264 (allowing recovery of expert fees in diversity eminent domain case as a matter of substantive Louisiana law under the *Erie* doctrine); *Baum v. United States,* 5 Cir., 1970, 432 F.2d 85 (recognizing the "expert witness exception to Rule 54(d)"); *United States v. Kolesar,* 5 Cir., 1963, 313 F.2d 835 (suit under Federal Tort Claims Act); *Green v. American Tobacco Company,* 5 Cir., 1962, 304 F.2d 70. *See, also, Adams v. Carlson,* 7 Cir., 1975, 521 F.2d 168, 172; *Burgess v. Williamson,* 5 Cir., 1975, 506 F.2d 870, 879; *Morris v. Carnathan,* N.D.Miss., 1974, 63 F.R.D. 374, 379; *Sperry Rand Corporation v. A–T–O, Inc.,* E.D.Va., 1973, 58 F.R.D. 132, 137.

As summarized in 10 Wright and Miller, Federal Practice & Procedure: Civil § 2678 at 236, 237:

> Finally, despite a few early decisions to the contrary, it seems well settled that a party's expert witnesses are entitled only to the regular statutory witness fees allowed by Section 1821 and that no costs will be allowed for any extra tests that the prevailing party might conduct in the hope of circumventing this restriction.

## SUMMARY AND CONCLUSION

The complaint and the evidence at trial "covered the waterfront", raising issues of some merit and others of no merit. This has necessitated an opinion of unusual length, so much so that it seems appropriate that we should summarize, as briefly as possible, our holdings and conclusions. The applicable law has been condensed as much as possible at the outset.

The subclasses of plaintiffs, consisting of the pretrial detainees and convicts, were certified by the District Court and are represented by the named plaintiff, Marvin Jones, although his individual claims are not properly before us for decision.

The evidence did not establish that the old Jackson County jail was unfit for human habitation under any modern concept of decency. The jail conditions were not "uncivilized" or "barbaric" or "inhumane".

With respect to the bull pens, the findings that they were integrated are clearly erroneous.

The attacks brought by the plaintiffs on (1) fire safety, (2) heating, (3) cooling, (4) ventilation, (5) food, (6) the handling of prison mail, (7) medical attention, (8) the use of trusties for limited purposes, (9) the lack of outdoor recreational facilities, (10) prisoner safety, (11) lack of contact visitation privileges, and (12) sanitation were not supported by substantial evidence, the findings on these questions are not clearly erroneous, and the issues were decided under correct legal standards. Consequently, the denial of relief on these topics is affirmed.

### Relief to be Granted on Remand

Upon receipt of our mandate, the District Court will enter an appropriate judgment, designed to accomplish the following results as to the old Jackson County jail:

1. Racial segregation of inmates will be prohibited.

2. Except for the "drunk tank" the number of prisoners confined in the *new jail* shall not exceed the number of permanently installed bunks. At those times when this capacity shall have been reached, no prisoners charged or convicted in counties other than Jackson shall be accepted in the new Jackson County jail unless the jailor is ordered in writing by a state circuit judge to confine him or her for the purpose of forestalling mob violence or a real likelihood of jail escape. This should eliminate undue crowding.

3. The jail authorities will prepare and submit for the approval of the District Court appropriate non-contact visitation rules for the old jail, but there shall be no

injunction on this subject because the evidence does not warrant such a remedy.[27] Our purpose here is to clarify the situation and remove it from the field of further dispute in the federal courts. When approved by the District Court, these policies shall be published to all inmates by appropriate notice, and the prison authorities will be expected to enforce them.

■ 4. The jail authorities will prepare and submit for the approval of the District Court a statement of policy as to the handling of violent, disturbed, or contagiously ill prisoners, so as to avoid the unnecessary exposure of these individuals to the general prison population. As in the immediately preceding paragraph, it will not be necessary that an injunction be entered on this subject, but it is our purpose that the situation shall be stabilized in compliance with the requirements of the law. Notice to the inmates must be duly given.

5. A declaratory judgment will be entered requiring that if loss of visitation rights is to continue as a sanction for a violation of jail rules, the jailer, as a matter of minimal due process, shall inform the inmate of the fact that rules violations carry such a penalty, inform him of the suspension, advise him of the reason for it, and give him an opportunity informally to show good cause, if any he has, why he should not be subjected to the sanction. These procedures shall be made known to the inmates.

6. The new orders to be entered by the District Court shall emphasize the duty of officials in charge of the jail to maintain its security and to hold the prisoners lawfully committed to it. This shall specifically include the duty of such officials to maintain discipline and cleanliness in the jail; to

thwart the entry of weapons, unlawful drugs, and implements of escape into the jail. A copy of the order in this respect shall be made known to all prisoners, by continuous posting or otherwise. The notion has arisen in some quarters that jails are maintained solely for the benefit of the inmates. Jails are also maintained, at public expense, for the public benefit. The Constitution neither directed nor intended that the federal courts in the discharge of their judicial duties should ignore these considerations. If prisoners are to be informed of their constitutional rights (as they should be) it is not amiss that they may also be informed that the Constitution does not excuse breaches of good conduct, violations of valid jail rules, or hazards to prison security.

*Additional Holdings*

■ We vacate that part of the order which directed the jail officials to post the list of "prisoner rights" set forth in our Footnote 17. The day to day management and operations of a jail must, within the framework herein set forth, be left for the duly elected and appointed public officials, who are answerable to the law if they deliberately or recklessly impinge on the constitutional rights of prisoners.

With respect to the state law claims for damages, we hold that the claims of the ten prisoners as to whom evidence of injuries was adduced at trial are not properly before us for decision. Those ten prisoners are not parties to this suit, and this is not a Rule 23(b)(3) class action. Any decision on their claims would have no *res judicata* effect, and we decline to decide those claims.

We find that pretrial detainees have not been denied meaningful access to the

---

27. In *Newman v. Alabama*, 5 Cir., 1977, 559 F.2d 283, 291 we said:

"[W]e conclude that prison authorities should not be required to maintain prison security with one eye on the subject and the other on the consequences of contempt, in which the District Court could convert a warden into prisoner. If abuses actually exist, there are other remedies less likely to interfere with the ongoing safety of the prison".

This means that except where the persistent conduct of those charged with the operation of a prison (jail) makes it necessary for the preservation of constitutional rights, prisons should not be required to operate under injunction. The duties of a jailer on the issues involved in this appeal have been clarified in this opinion. If the principles herein enunciated are not followed, the time will then have arrived for the use of injunctions as a remedy.

courts, but we also find that convicts have been denied that right of access to the courts mandated by *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Because the State of Mississippi vis a vis its penitentiary has created this situation, we decline to order any relief against the local defendants in this case. In affirming the denial of relief, we do so without prejudice to the right of the plaintiffs to file suit against the appropriate and responsible state officials.

The matter of attorneys' fees and costs will be remanded to the District Court for hearing and determination in accordance with the guidelines herein appearing.

The judgment of the District Court will be affirmed in all respects herein indicated and the case remanded for further proceedings not inconsistent herewith.

AFFIRMED IN PART.

REMANDED IN PART.

ALVIN B. RUBIN, Circuit Judge, concurring in part and dissenting in part.

This suit originated as a class action more than five years ago and its tortuous path is traced in the majority opinion. The complaint did not ask the federal court to free a single condemned criminal. It did not request that a federal judge interfere in any way with the judicial processes of the State of Mississippi. It sought only an order that, in confining persons in a county jail, the officials of that state comply with guarantees that the federal constitution extends to everyone in the land, mighty or oppressed, free or convicted: protection against cruel and inhuman punishments, equal protection, the right to counsel and due process of the law. Ancillary thereto, it sought their compliance with the laws of the State of Mississippi.

My brethren now order injunctive relief to remedy a number of violations of the federal constitution in the operation of the Jackson County Jail. While I agree that the plaintiffs are entitled to all of the relief granted, I believe they should be awarded much more in this court, and that they should have another day in district court on their class action claims for monetary damages. I dissent, therefore, from the failure of my brethren to accord plaintiffs their full measure. I dissent also from the circumscriptions imposed by the majority that in effect grant the nonappealing defendants relief they never sought.

I agree that the defendants must be enjoined:

1. From continuing racial segregation in the jail;
2. From confining in any cell in the new jail a greater number of prisoners than the number for which it was designed and constructed.

The majority opinion grants further relief that I agree should be accorded. By what is carefully called an "order," or in one instance a "declaratory judgment," and not an "injunction," they require the jail authorities:

1. To prepare new visitation rules.
2. To submit a statement of policy concerning the separation of violent, disturbed or contagiously ill persons from the general jail population.
3. To grant minimal due process rights to pretrial detainees.

For reasons set forth below, I would accord greater relief than the majority. Moreover, I would incorporate all of the orders into a single injunction. The majority opinion fails to explain the difference between an "order" and an "injunction". The order with respect to visitation is said to be designed "to clarify the situation and remove it from the field of further dispute." The "order" with respect to prisoner protection is said to relate to a "statement of policy." If these orders are complied with, there will be no need for further action. If they are not executed, I presume that contempt proceedings would be appropriate. What is accomplished by calling these by a different name, other than to avoid the use of the term "injunction," I do not perceive.

My brethren also deny any relief with respect to the pending state claims. They properly point out "that Mississippi does

have a statutorily articulated policy which commands humane treatment for the county jail prisoners." The record in my opinion shows that what has been commanded by the state's statutes has not always. been performed by its county jailers. I would preserve the plaintiffs' right to seek damages for these violations and for the invasions of their federal constitutional rights.

In some respects, I concur with the conclusions the majority has reached in denying some of the relief initially sought. In many others, I respectfully differ. To trace my differences and agreements requires me to discuss a number of matters separately:

## I. FEDERAL CONSTITUTIONAL VIOLATIONS

It is clear from those parts of the majority opinion with which I concur that the Jackson County Jail was, when this suit was filed, and still is, being operated in a manner that violates the federal constitution. The most egregious, though not the sole, wrongs were racial segregation of its prisoners, and such intense overcrowding as to constitute cruel and unusual punishment and violation of due process. It is implicit in the trial court's actions that the trial judge, despite his explicit disclaimer, found the confinement of prisoners in the old jail to be unconstitutional, for on December 6, 1977 that court ordered a new jail ready by September 15, 1978. It obviously had no jurisdiction to decree any relief were the present jail being operated without constitutional violation. It is implicit in my brethren's opinion that the old jail was operated in an unconstitutional manner when

this suit was filed, and that, at the time of trial, it was still being operated unconstitutionally in at least some respects beyond the continued practice of racial segregation for, otherwise, this court would lack jurisdiction to issue any order or prescribe any other relief beyond integration of the jail; were racial segregation the sole problem, there would be no need to discuss the history of the county bond issue or the architecture of the new structure and the facilities it will afford.

With all respect for the views of my brethren, I cannot, therefore, concur in their failure to state explicitly that the defendants have violated the plaintiffs' federal constitutional rights or in their view that mere completion of the new jail has eliminated the need for a broader injunction. These matters are not unrelated: the forthright declaration that jail operation has been and is likely to continue to be violative of federal rights not only is the sole justification for the relief the majority accord; it also is the reason why that relief provides neither adequate recompense for past wrongs nor appropriate protection against their future repetition.

In discussing whether the majority opinion accords the plaintiffs the protection needed to redress their wrongs, I accept for the purposes of this case the precept that findings of fact of the trial judge are to be accepted unless clearly erroneous. Rule 52, Federal Rules of Civil Procedure. A number of federal circuit courts have qualified the clearly erroneous rule when reviewing constitutional facts found by federal trial courts.[1] To review the 1520 pages of tran-

---

1. *See Cousins v. City Council of Chicago,* 7 Cir. 1972, 466 F.2d 830, 837, *cert. denied,* 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151; *Guzick v. Drebus,* 6 Cir. 1970, 431 F.2d 594, 599, *cert. denied,* 1971, 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231; *United States v. Baker,* 3 Cir. 1966, 364 F.2d 107, 110 n.4, *cert. denied,* 385 U.S. 986, 87 S.Ct. 596, 17 L.Ed.2d 448.

The doctrine allowing reexamination of findings of constitutional fact was developed by the Supreme Court in appeals from state court to ensure that federal rights were given a hospitable hearing at the state level. *See, e. g., Ed-*

*wards v. South Carolina,* 1963, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697; *Napue v. Illinois,* 1959, 360 U.S. 264, 271–72, 79 S.Ct. 1173, 1178–79, 3 L.Ed.2d 1217; *Feiner v. New York,* 1951, 340 U.S. 315, 322–24 & n.4, 71 S.Ct. 303, 307–08, 95 L.Ed. 295 (Black, J., dissenting); *Fiske v. Kansas,* 1927, 274 U.S. 380, 385–86, 47 S.Ct. 655, 656–57, 71 L.Ed. ˙1108. *See generally* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System 590–610 (2d ed. 1973). Its application in the context of Rule 52, F.R.C.P., presents added difficulties in that

script in the present case by some other standard, such as strict scrutiny, with respect to the matters now before us would not alter my conclusions. So I accept the clearly erroneous rule as applicable in this case, reserving for discussion in a case where it must be squarely met its applicability and significance in matters of constitutional fact.

## II. NECESSITY FOR FURTHER RELIEF

Let us then assume that the fact findings are correct, except insofar as they are clearly erroneous, as the majority have found them in at least some respects to be. Problems in the Jackson County Jail were acute when Sheriff Diamond took office in 1972; they remained grave until Sheriff Ledbetter succeeded him in 1976. While they were alleviated to some extent after that, my brethren agree that constitutional violations continued even then, and Sheriff Ledbetter's administration began three years after this suit was filed.

Even had conditions improved dramatically at the Jackson County Jail during the course of this litigation, that would not obviate the need for injunctive relief against future violations. *See Allee v. Medrano,* 1974, 416 U.S. 802, 810, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566, 578. Only if the defendants meet their burden of proving that "the allegedly wrongful behavior could not reasonably be expected to recur" would equitable relief be unwarranted. *United States v. Concentrated Phosphate Export Association, Inc.,* 1968, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344, 349. *See also Gates v. Collier,* 5 Cir. 1974, 501 F.2d 1291, 1321.

Nor have the defendants shown that respect even for explicit court orders that would justify the assumption that they will faithfully fulfill their duties in the future. Without, as far as the record discloses, so much as a by-your-leave or a request for a time extension, they have ignored the district court's order to complete the new jail. When on October 18, 1978 this case was orally argued, counsel informed this court that the Jackson County Jail was still being used as the sole place for confinement in the county and the new jail was still not in operation although affidavits filed in the record after argument assure us that it "has been completed and is physically" ready for occupancy. One such ex parte affidavit stated that the new jail would be in operation on February 15, 1979, but nothing filed in the record tells us that this has been accomplished. The majority opinion states that the new jail is now in operation, and I accept this factual statement, but this was accomplished 14 months after the appeal was filed and five months after it was argued.

Even if, therefore, by the time this opinion is filed, all the persons detained are housed in the new jail, this does not as my brethren assume, remedy all the problems of the past merely because ample and sanitary space exists in which to do so. I would issue an injunction that would assure that repetition of this six year old suit will not be necessary. There is even more reason to provide the plaintiffs court protection because completion of the vaunted new jail has apparently not only taken more time than the district court allowed but has proceeded at what appears to be a leisurely pace. The record bears no evidence that the defendants exerted themselves to the utmost to obtain new facilities as soon as possible. For example, they say in post-argument affidavits that their staff had to be trained to operate the new jail. Why this training could not have taken place while final construction was proceeding is not evident. There is no evidence of record that the defendants made any effort to expedite events. Their lives proceeded in accustomed fashion; relief for several thousand human beings was evidently not a matter of first concern.

---

there is no overriding federal concern justifying strict scrutiny of federal findings of fact. On the other hand, such intra-system supervision

lacks the constitutional difficulties an inter-court (federal-state) conflict provides.

Moreover, because of the demonstrated poor condition of the old jail, and the defendants' affidavit that it will not be used in the future to confine anyone overnight, I would enjoin the use of the old jail for any other purpose. In the light of the past violations of law recognized by the majority, I would take this simple step to be certain that what has been promised to the court by jail officials will be performed without further delay or litigation and that there will be no future reversion to past practices.

None of the relief accorded by the majority compensates Jackson County prisoners for the unconstitutional deprivations they were suffering prior to the time this case was filed and during the six years it has been pending. The opening of a new jail after this case was argued on appeal addresses none of the injury done them. I would, therefore, remand for class certification and award of damages as more fully set forth below.

### III. CONSTITUTIONAL RIGHTS OF CONFINED PERSONS

My brethren note that most of the persons who have been confined at the jail are pretrial detainees, accused of crime but "not, as yet, guilty of anything," *Rhem v. Malcolm*, 2 Cir. 1974, 507 F.2d 333, 338, even though there may be probable cause for their trial. Those pretrial detainees who remain in jail more than a few hours are for the most part poor. The well-to-do are doubtless able to provide bond.

The sole justification for confinement pretrial is to assure attendance at trial; therefore, pretrial detainees cannot constitutionally be subjected to any hardships except those absolutely necessary to ensure their continued confinement. *See, e. g., Campbell v. McGruder*, 1978, 188 U.S.App. D.C. 258, 266, 580 F.2d 521, 529; *Feeley v. Sampson*, 1 Cir. 1978, 570 F.2d 364, 369–70; *Miller v. Carson*, 5 Cir. 1977, 563 F.2d 741, 750; *Duran v. Elrod*, 7 Cir. 1976, 542 F.2d 998, 999; *United States ex rel. Tyrrell v. Speaker*, 3 Cir. 1976, 535 F.2d 823, 827; *Rhem v. Malcolm, supra*, 507 F.2d at 336;

*Jones v. Wittenberg*, N.D.Ohio 1971, 323 F.Supp. 93, 100, *aff'd sub nom. Jones v. Metzger*, 6 Cir. 1972, 456 F.2d 854. I fail to perceive any reason why the probable cause for their detention, so emphasized by my brethren, justifies anything more than their simple confinement until they can be tried.

Even persons duly convicted and serving sentences are not deprived of the protection of the constitution. An inmate "retains all the rights of an ordinary citizen except those expressly or by necessary implication, taken from him by law." *Jackson v. Godwin*, 5 Cir. 1968, 400 F.2d 529, 532, *quoting Coffin v. Reichard*, 6 Cir. 1944, 143 F.2d 443, 445, *cert. denied*, 1945, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001. *See also Pell v. Procunier*, 1974, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501; *Cruz v. Beto*, 1972, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263, 267; *Washington v. Lee*, M.D.Ala.1966, 263 F.Supp. 327, 331, *aff'd per curiam*, 1968, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212. There can be little doubt from the facts found by the majority that at least some of their rights have been violated.

### IV. SEPARATION OF PRETRIAL DE-TAINEES FROM CONVICTS AND PROTECTION OF CONFINEES

While our decisions have recognized that prison and jail officials have broad discretion in classifying convicts confined within their institutions, I would require further measures than the majority with respect to separation of inmates; the jailers should be required to do more than merely protect prisoners from persons who are violent or contagiously ill; they should be required also to separate pretrial detainees from convicts. Whether or not this is called "classification" is immaterial. Of course each inmate at the Jackson County Jail, whether or not convicted of a crime, has a constitutional right to be segregated from those who endanger his or her security, and from persons contagiously ill. *See, e. g., McCray v. Sullivan*, 5 Cir. 1975, 509 F.2d 1332, 1334, *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86. I would hold that

pretrial detainees have a due process right to be held in facilities apart from convicted inmates even if this necessitates physical modification of the jail. *See, e. g., Barnes v. Government of Virgin Islands,* D.V.I.1976, 415 F.Supp. 1218, 1232–33; *Hamilton v. Landrieu,* E.D.La.1972, 351 F.Supp. 549, 552; *Jones v. Wittenberg,* N.D. Ohio 1971, 330 F.Supp. 707, 717, *aff'd sub nom. Jones v. Metzger,* 6 Cir. 1972, 456 F.2d 854. The facilities in the new jail permit this kind of separation with nothing more than a slight effort by the jailers.

## V. SECTION 1983 CLAIM FOR DAMAGES

Plaintiffs sought primarily injunctive relief, but they also prayed for compensation in damages for the conditions in the Jackson County Jail violating their constitutional rights. The majority confront this request only in the context of the claim of physical abuse by inmate trusties and fellow prisoners, and conclude that § 1983 provides a remedy for such violence only when the conduct of jail officials rises to the level of intentional or reckless disregard of a prisoner's constitutional rights. With all respect, I believe my brethren have failed to distinguish between the nature of the conduct that must be shown to establish a violation of constitutional rights and whether, if such a violation is shown, the degree of culpability justifies the imposition of damages under § 1983. In so doing, they have departed from Fifth Circuit precedent and I must dissent from their conclusion.

Since *Monroe v. Pape,* 1961, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505, the Civil Rights Act has been read "against the background of tort liability that makes a man responsible for the natural consequences ·of his actions." Neither the language of § 1983, nor its interpretation by the Supreme Court, suggests that only intentional invasions of constitutional rights are within its protection. In *Whirl v. Kern,* 5 Cir. 1968, 407 F.2d 781, *cert. denied,* 1969, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177, this court concluded that inadvertent and negligent infringements of constitutional rights are remediable under § 1983. While

that section of *Whirl v. Kern* discussing official immunity has been eroded, its holding regarding the prerequisites for stating a claim under § 1983 remains the law of the circuit and I cannot agree with the majority that it has been overruled sub silentio. *See, e. g., Bryan v. Jones,* 5 Cir. en banc 1976, 530 F.2d 1210, 1215, *cert. denied,* 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145, and concurring opinion of Judge Brown, 530 F.2d 1215 n.1; *Johnson v. Greer,* 5 Cir. 1973, 477 F.2d 101, 105–06; *Roberts v. Williams,* 5 Cir. 1971, 456 F.2d 819, 825, *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110.

In *Bryan v. Jones, supra,* 530 F.2d at 1215, this court en banc held that, if a jailer "negligently establishes a record keeping system in which errors of this kind are likely, he will be held liable. But if the errors take place outside of his realm of responsibility, he cannot be found liable because he has acted reasonably and in good faith." The court went on to hold that reasonable good faith is a *defense* to a charge of negligent false imprisonment; presumably, like other affirmative defenses, this must be proved by the defendant.

Other courts have agreed that negligent conduct resulting in the deprivation of a clearly established constitutional right is actionable under § 1983. *See, e. g., Navarette v. Enomoto,* 9 Cir. 1976, 536 F.2d 277, 281, *rev'd on other grounds sub nom. Procunier v. Navarette,* 1978, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24; *Fitzke v. Shappell,* 6 Cir. 1972, 468 F.2d 1072, 1077 n.7; *Howell v. Cataldi,* 3 Cir. 1972, 464 F.2d 272, 279; *Puckett v. Cox,* 6 Cir. 1972, 456 F.2d 233, 234–35; *McCray v. Maryland,* 4 Cir. 1972, 456 F.2d 1, 5–6; *Carter v. Carlson,* 1971, 144 U.S.App.D.C. 388, 395 and n.20, 447 F.2d 358, 365 and n.20, *rev'd on other grounds sub nom. District of Columbia v. Carter,* 1973, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613; *Madison v. Manter,* 1 Cir. 1971, 441 F.2d 537, 538.

A plaintiff suing under § 1983 must, of course, demonstrate that the alleged wrong resulted in a deprivation of a right secured by the Constitution or laws of the United States. *See, e. g., Navarette v. Enomoto,*

*supra*, 536 F.2d at 281; *Whirl v. Kern, supra*, 407 F.2d at 789 n.9. The "simple negligence" sufficient in other circumstances to constitute a tort does not always demonstrate a violation of federal rights. *See, e. g., Bonner v. Coughlin*, 7 Cir. en banc 1976, 545 F.2d 565; *Page v. Sharpe*, 1 Cir. 1973, 487 F.2d 567; *Tate v. Blackwell*, 5 Cir. 1973, 475 F.2d 193, *cert. denied*, 412 U.S. 922, 93 S.Ct. 2743, 37 L.Ed.2d 149; *Nettles v. Rundle*, 3 Cir. 1971, 453 F.2d 889.

Thus, for a claim of inadequate medical care to rise to the level of a violation of the Eighth Amendment the plaintiff must show "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 1976, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. *Accord, Smart v. Villar*, 10 Cir. 1976, 547 F.2d 112, 114; *Hampton v. Holmesburg Prison Officials*, 3 Cir. 1976, 546 F.2d 1077. *See also Williams v. Vincent*, 2 Cir. 1974, 508 F.2d 541. It is both a logical error and a disregard of our precedent to conclude that the other constitutional rights involved here may not be infringed by negligence or by actions that are somewhat less egregious than clear indifference.

My brethren hold, and I agree, that at least some constitutional violations were established here. Some of these wrongs, such as the racial segregation and other violations that occurred during the period prior to the time Sheriff Ledbetter took office, were apparently wilful or at least committed in clear indifference to established constitutional rights. The trial court made no findings concerning these acts, nor with respect to whether or not the actions of the jailers during Sheriff Ledbetter's regime violated § 1983. We should, therefore, remand the case for consideration of § 1983

liability, and of the defendants' official immunity under the standards set forth in *Procunier v. Navarette*, 1978, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24, and *Bogard v. Cook*, 5 Cir. 1978, 586 F.2d 399. If defendants are not shielded by their qualified immunity, the district court should proceed to hear evidence concerning individual damages after appropriate notice is given to class members.[2] *See* Section VI, *infra*. Even if only nominal damages are due, they should be assessed. *See Carey v. Piphus*, 1978, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252.

I must also disagree with the conclusion of my brethren regarding the specific claim for violation of plaintiffs' right to personal security. Inmates are in no position to defend themselves from attacks from other prisoners. It is incumbent upon jail officials to adopt reasonable measures to ensure the safety of those individuals in their charge. While occasional, isolated attacks by one prisoner or another do not create a climate inconsistent with constitutional rights, confinement in a jail where there is a pervasive risk of harm, exacerbated by overcrowding, inadequate classification methods or supervision, and lack of recreation, violates constitutional standards. *See, e. g., Finney v. Arkansas Board of Corrections*, 8 Cir. 1974, 505 F.2d 194, 201, *aff'd sub nom. Hutto v. Finney*, 1978, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522; *Woodhous v. Virginia*, 4 Cir. 1973, 487 F.2d 889, 890; *Gates v. Collier*, 5 Cir. 1974, 501 F.2d 1291, 1308–09; *Alberti v. Sheriff of Harris County*, S.D.Tex.1975, 406 F.Supp. 649, 669. Properly evaluated, the conditions in the Jackson County Jail may be found to have created such an unconstitutionally danger-

---

**2.** I must also conclude that Jones's individual claims are properly before us, and that he should be entitled to prove his damages on remand. In denying Jones's motion to appeal in forma pauperis, this court was not necessarily making a determination that the "partial final judgment" dismissing his claims was final for purposes of Rule 54(b), as stated in footnote 2 of the majority opinion. I think it far more likely that the motion was denied because, as a denial of injunctive relief, the district court

order could be appealed on an interlocutory basis within 30 days under 28 U.S.C. § 1292(a)(1) and Rule 4(a), F.R.A.P., *see Baldwin v. Redwood City*, 9 Cir. 1976, 540 F.2d 1360, 1364, *cert. denied*, 1977, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223; when Jones failed to appeal within that period, he was required to wait until final judgment was entered. That time has arrived, and dismissal of his claims is now subject to review. He, like other members of the class, is entitled to relief.

ous atmosphere. I would therefore direct the trial court to make findings on remand with respect to this claim and any defense that may be offered.

Although as discussed above, I would hold that a showing of negligent maintenance of unconstitutional conditions by the defendant is sufficient to establish a § 1983 claim, if "deliberate indifference" is required, I believe the defendants have demonstrated such disregard for the welfare of their charges. They have deliberately allowed the conditions my brethren find impermissible under constitutional standards to persist for almost six years despite this court challenge, and even worse conditions to prevail during the first three of those six years and in the period before suit was filed. Some more egregious violations of constitutional rights were terminated only at the end of the Diamond administration, such as solitary confinement in the "hole" without due process safeguards, and total lack of supervision by free-world jailers at night and on weekends. These deliberate decisions to inflict punishment were not only unconstitutional; they contributed to the atmosphere of violence and fear entitling plaintiffs to § 1983 relief.

Evidence was taken concerning the claims of ten prisoners. I would consider this at least ancillary to the class action 23(b)(2) claims, hold them properly before us for decision and decide them. *See* Section VI, *infra*.

## VI. CLASS ACTION: INMATE SECURITY AND STATE LAW CLAIMS

My brethren dwell at length on the humane conditions required by Mississippi state law; yet they decline to consider the individual pendent state law claims because the class action was never certified under Rule 23(b)(3), that is, as a claim for damages for the individual prisoners, and any decision now reached on appeal would not have res judicata effect. Although they leave open the possibility of a new 23(b)(3)

suit, some of those claims may have lapsed as a result of the statute of limitations. Miss.Code Ann. § 15–1–49. My brethren comment, in footnote 13, that jail conditions were "generally portrayed as deplorable" prior to the time Sheriff Diamond took office in 1972. Claims for damages suffered during this period should not be ignored.

The complaint in this case may not have been drawn as artfully as possible, but it clearly is a class action and seeks relief under both Rule 23(b)(2) and (b)(3), Federal Rules of Civil Procedure. *See* majority opinion, footnote 25. Although injunctive relief was the principal objective, damages might be awarded as an incident even to a (b)(2) action. *See, e. g., Senter v. General Motors Corp.*, 6 Cir. 1976, 532 F.2d 511, 525, *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150; 7A C. Wright & A. Miller, Federal Practice and Procedure; Civil § 1775 at 19 n.31 (Supp.1978) collecting cases; 3B Moore's Federal Practice, ¶ 23.40[4], at 23–304–05 (2d ed. 1978). This is the intimation of the note of the Advisory Committee recommending the change to the present text of Rule 23(b)(2). Advisory Committee Note, 39 F.R.D. 98, 102 (1966). For a general discussion, see Comment, *Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2)*, 88 Yale L.J. 868 (1979).

However, it is unnecessary to dwell on whether the (b)(2) claim warrants the award of damages sustained as an incident of the conduct sought to be enjoined. As the majority opinion notes, over 8,500 persons might have (b)(3) claims under § 1983 or the pendent Mississippi law claims; whether they wish to assert these claims and, if so, what evidence they might bring to counsel's attention is unknown.

Even if plaintiff's counsel failed to insist on (b)(3) certification, the complaint seeks it. The issue before the trial judge and the issue before us is not counsel's conduct of the case, but whether the constitutional and

statutory rights of the plaintiffs have been violated. When a class action is filed, some responsibility for its proper conduct devolves on the trial judge. Without in any way compromising the court's impartiality with respect to the substantive issues, the trial judge must not only promptly certify or deny certification to the class action; in considering certification, he must take into account the ability of counsel, and, even after certification, it may become his duty to appoint additional counsel for the class in order to assure an adequate trial on its behalf, whether to victory or defeat. Rule 23(b) affords ample authority to the court to enter appropriate orders to guide the conduct of class actions.

I respectfully suggest that the federal judge in a class action is not to be a "passive observer, allowing the initiative of the opposing attorneys to control the course of the litigation." Comment, *Adequate Representation, Notice and the New Class Action Rule: Effectuating Remedies Provided by the Securities Laws*, 116 U.Pa.L.Rev. 889, 898 (1968). We have ourselves endorsed this concept: "[I]n class actions under the civil rights statutes, the trial court bears a substantial management responsibility over the conduct of the litigation, which arises the moment the class is requested." *Jones v. Diamond*, 5 Cir. 1975, 519 F.2d 1090, 1098.

Concern for the rights of the members of a class is not for the conscience only of trial judges; we who sit on appeals ourselves bear a duty in that regard. Accordingly, I would remand the case to permit the plaintiffs to seek proper certification under Rule 23(b)(3), with, of course, all that entails, including proper notice. The rights of individual class members to damages should then be determined in accordance with the substantive principles I have suggested. I would remand the damage claims of the ten persons whose claims have already been considered by the trial court for reconsideration without awaiting (b)(3) certification in the light of this opinion as an incident to the 23(b)(2) relief sought.

## VII. OPPORTUNITY FOR EXERCISE

Exercise is not mere recreation. Unused muscles atrophy. Unexercised bodies become ill. Enforced inertia is itself the denial of a basic physical and mental need. *See Miller v. Carson*, 5 Cir. 1977, 563 F.2d 741, 749–51. Nor is it only those confined for years who need exercise. Surgeons recognize that physical activity is so important that they are requiring patients to get out of bed and resume some form of exercise within 24 hours after serious surgery. If outdoor exercise is not available, then opportunity for indoor exercise should be afforded those confined for lengthy periods. It does not appear to me that we can ignore as judges what is common knowledge concerning the needs of the human body merely because no doctor has testified to it.

The majority opinion points out that facilities for outdoor exercise are available at the new jail. However, many persons may have been confined for lengthy periods in the old Jackson County jail without opportunity for any exercise, indoors or out. Those who have been confined for a lengthy period and who can show injury as a result of lack of exercise should be given an opportunity to do so.

## VIII. REGULATION OF MAIL

As the majority opinion states, the regulation of convict correspondence in this circuit is governed by our recent decision in *Guajardo v. Estelle*, 5 Cir. 1978, 580 F.2d 748. *Guajardo*, however, did not deal with the rights of pretrial detainees or the first amendment rights of those with whom such persons, as yet uncondemned, would correspond. The freedom of speech of persons not yet found guilty of any crime and of those with whom they seek to communicate should be unrestrained save insofar as their safe detention pending trial requires.

Under the facts of this case, I agree that *Guajardo* standards should be applied to pretrial detainees as well as to convicted persons. The Jackson County Jail is a relatively small institution. Parchman prison-

ers are confined there. Even if each person slept in a single cell in the new jail, there is the possibility of prisoner contact. The majority opinion, moreover, would permit pre-trial detainees to be confined in the same cells as some convicts. Therefore, in the present case I agree that the same standards can constitutionally be applied to pre-trial detainees in the interest of institutional security.

## IX. ACCORDING "RELIEF" NOT SOUGHT

The defendants have filed no cross-appeal. They have sought no relief from the trial court's order. On their own motion, my brethren vacate that part of the district court order that directed the jail officials to post the relatively simple list of "Prisoner Rights" set forth in their footnote 17. Even if the district court's decision to require this notification so that inmates might be aware and jail officials might constantly be reminded of the prisoners' fundamental rights was clearly erroneous, or even plain error, I do not understand on what authority they act sua sponte. *See Nuelsen v. Sorensen,* 9 Cir. 1961, 293 F.2d 454, 462. *Cf. Wright v. United States,* 8 Cir. 1973, 482 F.2d 600, 610; *Delancey v. Motichek Towing Service, Inc.,* 5 Cir. 1970, 427 F.2d 897, 900; *Strickler v. Pfister Associated Growers, Inc.,* 6 Cir. 1963, 319 F.2d 788, 791.

Moreover, I do not understand why my brethren feel called upon to order the district court to remind the jail officials of their duties. Neither party has sought this, either in the trial court or on appeal.

Finally, again of their own volition and not in response to any issue raised on appeal by the defendants, the majority have reviewed in some detail "the tactics used in this case on behalf of the plaintiffs" and expressed both dismay at the manner in which this case proceeded and concern with the "pattern and practice of [plaintiffs'] counsel." None of these matters were either briefed or argued before us. The district court must assess attorney's fees and costs in accordance with the standards set forth. in *Johnson v. Georgia Highway Express, Inc.,* 5 Cir. 1974, 488 F.2d 714. I would leave it to the district judge to make findings and reach conclusions on that subject without assaying trial tactics that were sanctioned by the same trial court that denied all substantive relief to the plaintiffs.

## X. CONCLUSION

Those who violate the state's criminal laws must be punished in accordance with its commands. Society requires protection from those who transgress its laws, and in many instances the only adequate protection is by incarceration. The Constitution accords just desserts to even the most undeserving. "For, if sympathy for violent criminals is misplaced, prudent self-interest as well as moral imperatives require that, while we deal with them firmly, we must also deal with them in ways that are fair and not barbarous."[3] This utilitarian and moral principle does not stand alone as a predicate for judicial relief; the Constitution provides both warrant and duty for us. Because I believe that the majority have failed to perform that duty with respect to many of the plaintiffs' rights, I respectfully dissent in those many regards discussed above.

---

**3.** Hughes, "American Terror," a review of Silberman, *Criminal Violence, Criminal Justice,* *New York Review of Books,* Jan. 25, 1979, pp. 3–4.